Anthony GRIEGO, Petitioner,

v.

The PEOPLE of the State of
Colorado, Respondent.

No. 99SC228.

Supreme Court of Colorado,
En Banc.

Feb. 20, 2001.

As Modified on Denial of Rehearing
March 12, 2001.

**2** 

David S. Kaplan, Colorado State Public Defender, Karen N. Taylor, Deputy State Public Defender, Denver, CO, Attorneys for the Petitioner.

Ken Salazar, Attorney General, Roger G. Billotte, Assistant Attorney General, Appellate Division, Denver, CO, Attorneys for the Respondent.

JUSTICE BENDER delivered the Opinion of the Court.

In this appeal we hold that the offense of driving after revocation prohibited [1] includes the material element of "knowingly" as the culpable mental state of this crime and that jury instructions should include the definition of "knowingly" as defined in section 18–1–501(6), 6 C.R.S. (2000). The court of appeals in *People v. Griego,* 983 P.2d 99 (Colo.App. 1998) held that the trial court's failure to define the culpable mental state of "knowingly" in its jury instructions was not error and affirmed Griego's conviction. We disagree with this reasoning. We hold that the jury should be instructed that the culpable mental state of this crime is knowingly and that the failure to so instruct constitutes constitutional error. However, because we follow the recent holding of the United States Supreme Court in *Neder v. United States,* 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), we hold that this instructional error is subject to constitutional harmless error analysis rather than structural error analysis. Our review of the record in this case leads us to conclude that the instructional error was harmless beyond a reasonable doubt. Thus, we affirm the judgment of the court of appeals.

## I. PROCEEDINGS BELOW

The facts presented at trial are as follows. The defendant, through his attorney, conceded that he was driving when his license was under revocation because he was a habitual traffic offender. The only issue that was contested was whether the defendant had knowledge of this revocation.

Lakewood police officer Nancy Gaertner testified that she saw the defendant, Anthony Griego, drive on a public highway in Jefferson County in April 1996. Agent Gaertner testified that, as she transported the defen-

---

1. Driving after revocation prohibited is part of the statutory scheme governing habitual traffic offenders. *See* § 42–2–201 to –208, 11 C.R.S. (2000). The statute in effect at the time the defendant was stopped made it

unlawful for any person to operate any motor vehicle in this state while the revocation of the department [of the person's license or privilege to drive for being declared a habitual traffic

offender] remains in effect. Any person found to be an habitual offender, who is thereafter convicted of operating a motor vehicle in this state while the revocation of the department prohibiting such operation is in effect, commits a class 6 felony and shall be punished as provided in section 18–1–105, C.R.S.

§ 42–2–206(1), 11 C.R.S. (1998).

dant to the police department, he "spontaneously said he knew he shouldn't be driving."

The prosecutor introduced into evidence a copy of a notice of revocation for revocation as a habitual offender, dated May 1993, sent via certified mail return receipt requested to the defendant's last known address.

The defendant's sister, Lisa Griego, testified that in May of 1993 she, her parents, and two other siblings lived at the address where the department had sent the notice of revocation. She said that the defendant did not live at this address. She explained that all five residents of the house had slots for their mail and that, although the defendant also received mail there, there was no slot in which to put his mail. Ms. Griego identified the signature on the receipt as that of her mother and said that she did not know what her mother did with the notice after signing it. She also stated that in the last five years her mother had been getting very forgetful.

At the jury instruction conference the court discussed the proposed instructions with both counsel. Defense counsel argued that a definition of the culpable mental state of "knowingly" "[went] along with the stock instruction as to voluntary act and culpable mental state" and tendered a stock instruction setting forth these principles. *See* CJI–Crim. 6:01. Defense counsel also argued that the court's instructions should include the culpable mental state of "knowingly," which is required for this offense and was contained in the defense's tendered instruction.

The court ruled that the tendered instruction need not be given to the jury, reasoning that the stock instruction defining the of-

fense, which required the prosecution to prove that the defendant had knowledge of the revocation as a result of his classification as a habitual traffic offender, was sufficient. In addition, the court stated that because the defendant's proposed definitional instruction stated the culpable mental state as "knowingly" while the stock elemental instruction listed the element as "knowledge," "[the] definition of knowingly as opposed to knowledge would [not] be particularly helpful" to the jury.

In closing, the prosecutor told the jury that the only element of the offense at issue was notice. "I'd submit that the issue really is was there notice.... That's why we're here today, for you to determine whether he had knowledge of this order, because if he did, then we've met all the other elements. If he didn't then we've failed." The prosecutor called the jury's attention to the permissive inference jury instruction,[2] which informed the jury that it may, but was not required to, find the fact of knowledge from various predicate facts, and argued that the jury should use this instruction to find that the prosecution had met its burden of proving notice.

Similarly, defense counsel, in his closing, agreed with the prosecutor that his client's knowledge of the revocation as a habitual offender was the only contested element and argued that the prosecution had failed to prove this element beyond a reasonable doubt.

[Knowledge] is the whole crux of the case, and that's what's missing in this case, and the prosecution has the burden—beyond a reasonable doubt—to prove that Mr. Grie-

2. The permissive inference instruction, based on stock instruction CJI–Crim. 37:02, read:

In any prosecution for driving after revocation prohibited, you may, but are not required to, find that the defendant had knowledge of the fact of such revocation or suspension from one or more of the following:

(a) A return receipt of a registered notice of the revocation or suspension mailed with sufficient postage to the last known address of the defendant as shown by the records of the Division of Motor Vehicles, and a copy of the notice so mailed.

(b) Delivery of the notice of revocation or suspension to the last known address of the defen-

dant as shown by records of the Division of Motor Vehicles.

(c) Personal service of such notice upon the defendant.

You may consider this evidence, together with all other evidence in this case, in determining whether or not the defendant had knowledge of the habitual traffic revocation, or the suspension of his driver's license.

You must bear in mind that you may, but are not required to make this finding. The prosecution always has the burden of providing each element of the offense charged beyond a reasonable doubt. The defendant is never required to testify or present any evidence.

go had actual knowledge that he had been declared by the Motor Vehicle Department a Habitual Traffic Offender, and his saying, well, you can assume this or think that or whatever, sure, you're the jury, all right, and you can really do whatever you feel is appropriate, but the prosecution has failed to present evidence of that whatsoever, much less to the degree of beyond a reasonable doubt.

After deliberation the jury returned a verdict of guilty.

The defendant appealed and the court of appeals affirmed. *Griego*, 983 P.2d at 100. The court of appeals acknowledged that knowledge is an essential element of driving after revocation prohibited. *Id.* at 101. Nonetheless, the court of appeals held that the trial court's failure to instruct the jury on the definition of the culpable mental state of "knowingly" did not constitute error because "[t]he [elemental] instruction given [in this case] adequately described [the element of knowledge] to enable the jury to apply the law to the facts." *Id.* at 102. We granted certiorari to review this ruling.[3] We affirm but employ different reasoning.

## II. ANALYSIS

Although the state concedes that knowledge is an element of the crime of driving after revocation prohibited, it argues that the word "knowledge" does not incorporate the culpable mental state of "knowingly" defined in section 18–1–501(6). Therefore, the state argues that the court of appeals was correct when it held that the trial court did not commit error when it rejected the defendant's tendered instruction containing the statutory definition of "knowingly." The defense, on the other hand, argues that we have clearly stated in our case law that the word "knowledge" refers to the culpable mental state of "knowingly" and, further, that the legislature has demonstrated its approval of this construction. We agree with the defense on this issue and conclude that the word "knowledge" does refer to the cul-

pable mental state of "knowingly ." We also conclude that the trial court's failure to instruct the jury on the definition of that culpable mental state was an error of constitutional magnitude. Nonetheless, we conclude that this error was harmless beyond a reasonable doubt and thus affirm the decision of the court of appeals.

### A. Culpable Mental States

To provide background for our discussion, we review the purpose behind defining culpable mental states statutorily and discuss the specific history of the culpable mental state requirement for driving after revocation prohibited.

"In the past, courts and legislatures developed a variety of definitions for different mental states, creating confusion about what the prosecution had to prove in a criminal case." *People v. Hall*, 999 P.2d 207, 216 (Colo.2000). In an effort to eliminate this confusion, the drafters of the Model Penal Code recommended that criminal codes articulate and define the specific culpable mental states that would suffice for criminal liability. *Id.* As part of the complete revision of Colorado's criminal code in 1971, the General Assembly followed this recommendation and adopted a provision specifically defining four culpable mental states intentionally, knowingly, recklessly, and with criminal negligence—applicable to all offenses in Colorado. *See* § 18–1–501; *Hall*, 999 P.2d at 216. To convict a defendant of any crime other than one of strict liability, the prosecution must prove that the defendant acted with one of these four culpable mental states. *Hall*, 999 P.2d at 217; *see also* § 18–1–103(1), 6 C.R.S. (2000) (mandating that the provisions of the criminal code govern the construction of any offense defined in any statute of the state). These culpable mental states apply not only when a statute explicitly spells out the culpable mental state required for commission of an offense, but also when, "[a]lthough no culpable mental state is expressly designated in a statute defining an offense . . . the pro-

---

**3.** The precise question on which we granted certiorari was: "Whether the court of appeals erred when it ruled, in conflict with *Jolly v. People*, 742 P.2d 891 (Colo.1987), and *People v. Parga*, 964 P.2d 571 (Colo.App.1998), that district courts need not define the culpable mental state of knowledge for the jury in a driving after revocation prohibited case."

scribed conduct necessarily involves such a culpable mental state." § 18–1–503(2), 6 C.R.S. (2000).

The driving after revocation statute does not on its face require a culpable mental state. Nonetheless, in *People v. Lesh*, 668 P.2d 1362, 1365 (Colo.1983), we held that "the People are required to prove the element of knowledge of the revocation order in a driving after [revocation] prohibited case." [4] We affirmed this holding in *Ault v. Department of Revenue*, 697 P.2d 24, 27 (Colo.1985). In *Jolly*, we concluded that our holding in *Lesh* was fully applicable to the misdemeanor offense of driving under restraint. *Jolly v. People*, 742 P.2d 891, 896 (Colo.1987). In that case, we also explained that *Lesh* makes clear that "the culpable mental state of 'knowingly' [defined in Title 18] with regard to the fact of revocation" is an element of driving after revocation prohibited. *Id.* at 898 (explaining that "knowingly" is the required mental state and then defining that term per section 18–1–501(6)).

"Knowingly" under Title 18 is a broad concept that may attach to conduct, "when [a person] is aware that his conduct is of such a nature," to a circumstance, "when [a person] is aware ... that such circumstance exists," or to a result, "when [a person] is aware that his conduct is practically certain to cause the result." *People v. Derrera*, 667 P.2d 1363, 1367 (Colo.1983).

> A person acts "knowingly" ... with respect to *conduct* or to a *circumstance* described by a statute defining an offense when he is aware that his conduct is of such a nature or that such circumstance exists. A person acts "knowingly" ... with respect to a *result* of his conduct, when he is aware that his conduct is practically certain to cause the result.

§ 18–1–501(6) (emphasis added).

■ After our decision in *Jolly* held the culpable mental state of "knowingly" applicable to the misdemeanor driving under restraint statute, the legislature amended that

statute to require a degree of mental culpability less than "knowingly." *See* ch. 207, sec. 3, § 42–2–130, 1993 Colo. Sess. Laws 936, 938–39; *see also People v. Ellison*, 14 P.3d 1034, 1036–37 (Colo.2000) (discussing in detail this new mental state). Significantly, the General Assembly did not, when it amended the misdemeanor driving under restraint statute, amend the driving after revocation prohibited statute. We must presume that, when the General Assembly legislates in a certain area of law, it does so with awareness of the judicial precedent in that area. *Terry v. People*, 977 P.2d 145, 149 (Colo.1999); *Vaughan v. McMinn*, 945 P.2d 404, 409 (Colo.1997). When the General Assembly amended the culpable mental state requirement for driving under restraint but did not amend the culpable mental state for driving after revocation prohibited, we must presume that it did so with awareness of our decisions in *Lesh, Ault,* and *Jolly,* and therefore chose to retain "knowingly" as the culpable mental state for driving after revocation prohibited.

The court of appeals reviewed *Lesh, Ault, Jolly,* and the legislative amendment to the driving under restraint statute in *People v. Parga*, 964 P.2d 571 (Colo.App.1998). In that case, the court of appeals reasoned, as we do today, that by changing the culpable mental state for driving under restraint while leaving in place the culpable mental state requirement for driving after revocation prohibited, the legislature demonstrated its intent to preserve the requirement that "[t]o be convicted of the felony[5] of driving after [revocation] prohibited, 'a defendant must know of the fact of revocation as a habitual offender," and the prosecution must prove that "the defendant ... acted 'knowingly' as that term is defined in [§] 18–1–501(6)." *Parga*, 964 P.2d at 573–74 (citation omitted).

After *Parga*, the General Assembly on two occasions amended the driving after revocation prohibited statute. *See* ch. 215, sec. 9, § 42–2–206, 1999 Colo. Sess. Laws 792, 796–

---

**4.** At the time of *Lesh*, the statute was titled "driving after judgment prohibited." *See* § 42–2–206, 17 C.R.S. (1973 & Supp.1982).

**5.** The penalty for driving after revocation prohibited has since been reduced from a class six felony to a class one misdemeanor. *See* ch. 215, sec. 9, § 42–2–206, 1999 Colo. Sess. Laws 792, 796–97; § 42–2–206, 11 C.R.S. (2000).

97; ch. 169, sec. 1, § 42–2–206, 2000 Colo. Sess. Laws 682, 682–83.[6] Both of these amendments left intact the statute's culpable mental state requirement. Thus, once again the legislature signaled its intent that to be convicted of the crime of driving after revocation prohibited the defendant must drive with "knowledge" that his license was under revocation. Further, the legislature implicitly adopted the *Jolly/Parga* holding that the term "knowledge" incorporates the culpable mental state of "knowingly" as defined in section 18–1–501(6).

Hence, both the principle of statutory construction requiring us to presume that the General Assembly legislates with awareness of judicial precedent and the principle of stare decisis cause us to reaffirm our earlier decisions that in a driving after revocation prohibited case the prosecution must prove that the defendant drove with the culpable mental state of "knowingly."[7]

We digress briefly to explain why, when a criminal statute requires that the actor act "with knowledge" of a specific circumstance, that unless specifically stated otherwise in the statute, the culpable mental state required is "knowingly." As noted, the statutory definition of "knowingly" applies to conduct, circumstance, and result. § 18–1–501(6); *Derrera*, 667 P.2d at 1367. The driving after revocation statute prohibits driving when a person's license is under revocation because he has been declared a habitual traffic offender. *See* § 42–2–206. Under this statute, revocation for habitual offender status constitutes a "circumstance" about which the person must have "knowledge."

Usually, when the culpable mental state of "knowingly" attaches to a verb describing the accused's *conduct*, it is stated in its adverb form as "knowingly." *See, e.g.*, § 42–2–405(2)(b)(I), 11 C.R.S. (2000) ("knowingly transport[ ] [certain illegal drugs] while operating a commercial vehicle during on-duty time"). When, however, as in this case, "knowingly" modifies a *circumstance* caused by something or someone other than the accused, it usually appears in its noun form as "knowledge."[8] Because the fact that a person's license to drive was revoked as a result of being a habitual traffic offender is "a *circumstance* described by a statute defining an offense" under section 18–1–501(6) (emphasis added), the word "knowledge" (the noun) implicates the culpable mental state of "knowingly" (the adverb).

Having reviewed the history of the culpable mental state requirement for driving after revocation prohibited and clarified why we use the word "knowledge" to indicate that the required culpable mental state is "knowingly," we turn to the question of whether it was error in this case for the trial court to refuse the defendant's tendered jury instruction defining that culpable mental state.

---

6. The 1999 amendment reduced the penalty for driving after revocation prohibited from a class six felony to a class one misdemeanor and created the new offense of aggravated driving with a revoked license, a class six felony. *See* ch. 215, sec. 9, § 42–2–206, 1999 Colo. Sess. Laws 792, 796–97. The 2000 amendment modified the misdemeanor penalty for driving after revocation prohibited. *See* ch. 169, sec. 1, § 42–2–206, 2000 Colo. Sess. Laws 682, 682–83.

7. By making explicit what was implicit in our cases, we reject an argument put forth by the prosecution. The prosecutor argues that, because section 18–1–501 states "[t]he following definitions are applicable to the determination of culpability requirements for offenses defined in this code," as driving after revocation prohibited is not part of the criminal code but rather is part of the habitual offender section of the motor vehicle code, the definition of "knowingly" at section 18–1–501 is inapposite. As explained above, our cases have held that the definition of "knowingly" in section 18–1–501(6) applies to the offense of driving after revocation prohibited. Additionally, the statutory section setting out the "[s]cope and application" of the Colorado criminal code mandates that "the provisions of this code govern the construction of and punishment for *any offense defined in any statute of this state, whether in this title or elsewhere.*" § 18–1–103(1) (emphasis added).

8. The wording of Colorado's Unmarked Human Graves statute illustrates both the case where "knowingly" attaches to conduct and where "knowingly" modifies a circumstance. That statute penalizes both the person who *"knowingly disturbs* an unmarked human burial" (conduct) and the person who *"has knowledge that* an unmarked human burial *is being unlawfully disturbed* and fails to notify the local law enforcement agency" (circumstance). § 24–80–1305, 7 C.R.S. (2000).

## B. Constitutional Error

We begin our analysis by setting out the constitutional principles implicated in this case. The United States and Colorado Constitutions guarantee the defendant in a criminal case both the right to have a jury decide his case and the right to have the prosecutor prove to that jury, beyond a reasonable doubt, every element of the charged offense. *See* U.S. Const. art. III, § 2, cl. 3; U.S. Const. amend. VI; U.S. Const. amend. XIV, § 1; Colo. Const. art. II, § 16; Colo. Const. art. II, § 23; Colo. Const. art. II, § 25; *Bogdanov v. People,* 941 P.2d 247, 252 (Colo. 1997); *People v. Snyder,* 874 P.2d 1076, 1080 (Colo.1994). To preserve these guarantees, we require that the trial court properly instruct the jury on every element of a crime. *See Bogdanov,* 941 P.2d at 252.

The culpable mental state of "knowingly" is an element of driving after revocation prohibited. *Lesh,* 668 P.2d at 1365. In this case, the trial court refused the defense's proposed instruction defining that element because the court believed the term "knowledge" was "a word the jury can deal with without specific definition" and that "the additional definition of knowingly as opposed to knowledge would [not] be particularly helpful to the jury." Ordinarily, words and phrases in our statutes should be "read in context and construed according to the rules of grammar and common usage." § 2–4–101, 1 C.R.S. (2000). However, when "[w]ords and phrases ... have acquired a technical or particular meaning, whether by legislative definition or otherwise, [they should] be construed accordingly." *Id.*

When the General Assembly created the four culpable mental states applicable to offenses under our statutes, it set forth *"precise statutory definitions* of these mental states, *which differ from the common usage of these same words." Palmer v. People,* 964 P.2d 524, 526 (Colo.1998) (emphasis added). Thus, the culpable mental state of "knowing-

ly" is not, in the words of the trial court, "a word the jury can deal with without specific definition," but instead is a term carrying a "technical or particular meaning," the definition of which must be presented to a jury if they are to "construe[ ][it] accordingly." § 2–4–101. A jury, therefore, can only fulfill its constitutionally mandated role of finding each element beyond a reasonable doubt when that jury has been instructed on the precise statutory definition for the required culpable mental state. *See People v. Martinez,* 634 P.2d 26, 28 (Colo.1981) ("[I]nstructions [that] fail to define all the elements of an offense charged, so that the jury may decide whether they have been established beyond a reasonable doubt, are constitutionally deficient."). Hence, we hold that the trial court's failure to instruct the jury as to the definition of "knowingly" was an error of constitutional magnitude.

## C. *Neder* Harmless Error Analysis Controls Earlier Precedent

Constitutional errors that occur during the course of a criminal proceeding fall into two categories: trial errors and structural errors. *People v. Dunlap,* 975 P.2d 723, 736 (Colo.1999). "Trial errors occur 'during the presentation of the case to the jury' and do not require reversal to comport with due process, but rather may be assessed under either harmless or plain error analysis." *Cooper v. People,* 973 P.2d 1234, 1242 (Colo.1999) (quoting *Arizona v. Fulminante,* 499 U.S. 279, 307–08, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). Structural errors, on the other hand, "are not amenable to either a harmless error or a plain error analysis because such errors affect 'the framework within which the trial proceeds,' and are not errors in the trial process itself." *Bogdanov,* 941 P.2d at 252–53 (quoting *Fulminante,* 499 U.S. at 310, 111 S.Ct. 1246). We have held that improperly instructing the jury on an element of a crime constitutes structural er-

ror. *Cooper*, 973 P.2d at 1242; *Bogdanov*, 941 P.2d at 253; *People v. Vance*, 933 P.2d 576, 580 (Colo.1997); *see also People v. Villa–Villa*, 983 P.2d 181, 183 (Colo.App.1999) (holding that trial court committed reversible error when it improperly instructed the jury on the knowledge requirement for driving after revocation prohibited).

We characterized a defendant's right to a jury trial, with the accompanying right to be found guilty beyond a reasonable doubt of every element of the offense, as a "structural guarantee" because the jury trial guarantee "reflects a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges." *Vance*, 933 P.2d at 580 (quoting *United States v. Wiles*, 102 F.3d 1043 (10th Cir.1996)).

However, the United States Supreme Court recently held that the error of *omitting* an essential element of a crime in jury instructions is not, under the Federal Constitution, amenable to structural error analysis but instead is subject only to harmless or plain error review. *Neder*, 527 U.S. at 8–15, 119 S.Ct. 1827. Although the Court in *Neder* characterized the error in that case as one of "omission," the Court's holding explicitly governs both the case where an element is "omitted" and where an element is "misdescribed." *See id.* at 10, 119 S.Ct. 1827.

The Court had two reasons for not differentiating between elemental omissions and elemental misdescriptions. First, the distinction between the two is often merely semantic. *See id.* at 10, 119 S.Ct. 1827. The misinstruction in the present case, for instance, could be described as either an error of omission or misdescription.[9] Second, irrespective of the formal differences between omissions and misdescriptions, the constitutional consequence of both is the same—in either case "the erroneous instruction precludes the jury from making a finding on the actual element of the offense." *Id.* at 10, 119 S.Ct. 1827. Thus, under *Neder*, as a matter of federal constitutional law, a jury instruction that is erroneous, either because the instruction omits or misdescribes an element of the offense, is not subject to structural error analysis but instead constitutes trial error subject only to harmless or plain error review.

█ Although there are persuasive reasons [10] to continue to subject elemental omissions or misdescriptions of jury instructions to structural error analysis, we are bound to follow the precedent set forth in *Neder*. Hence, we hold that when a trial court misinstructs the jury on an element of an offense, either by omitting or misdescribing that element, that error is subject to constitutional harmless or plain error analysis and is not reviewable under structural error standards. We therefore expressly disapprove of our contrary precedent on this issue.

## III. APPLICATION

█ Next, we address whether the instructional error in this case is harmless beyond a reasonable doubt. A constitutional

---

9. One could argue in the present case that although the word "knowledge" was in the elements instruction, the lack of definition caused that element to be effectively omitted. On the other hand, one could argue that, by virtue of the presence of the word "knowledge" in the elements instruction, the culpable mental state was included in the instructions, and that the lack of definition merely caused it to be misdescribed.

10. *See, e.g., Neder*, 527 U.S. at 30–40, 119 S.Ct. 1827 (Scalia, J., dissenting). In his dissent, Justice Scalia cautions that "[w]hen this Court deals with the content of [the jury trial] guarantee—the only [guarantee] to appear in both the body of the Constitution and the Bill of Rights—it is operating upon the spinal column of American democracy." *Id.* at 30, 119 S.Ct. 1827. Justice Scalia argues that "depriving a criminal defendant of the right to have the jury determine his guilt of the crime charged—which necessarily means his commission of *every element* of the crime charged—can never be harmless" and that *"the Constitution does not trust judges to make determinations of criminal guilt." Id.* at 30, 32, 119 S.Ct. 1827 (emphasis in original). Scalia also notes that, while it may be expedient to have appellate courts decide cases themselves by applying harmless error analysis rather than remanding for a new trial, expediency should not be appellate courts' chief concern when a right as central as the right to a jury trial is at stake. *Id.* at 40, 119 S.Ct. 1827. "Formal requirements are often scorned when they stand in the way of expediency. This Court, however, has an obligation to take a longer view." *Id.*

error is harmless when the reviewing court is confident beyond a reasonable doubt that the error did not contribute to the verdict obtained. *Neder*, 527 U.S. at 15, 119 S.Ct. 1827; *Blecha*, 962 P.2d at 942. The inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Blecha*, 962 P.2d at 942. Thus, we do not inquire into the sufficiency of the evidence but instead focus on whether, beyond a reasonable doubt, the error in the jury instructions did not contribute to the verdict.

In this case, the only contested issue for the jury to determine was whether the defendant drove with notice or knowledge that his license to drive was revoked because he was a habitual traffic offender. The defendant, through counsel, conceded that he drove when his license was under revocation because he was a habitual traffic offender. Our review of the record shows that the evidence bearing on the contested issue of knowledge was not overwhelming.[11]

Even though the jury was not given the culpable mental state instruction, it was instructed to find that the defendant actually knew that his license or privilege to drive was under revocation because the defendant had been declared a habitual offender—that is, that he had notice of the revocation. In addition, the jury was told several times in closing arguments by opposing counsel that it must find that the defendant drove with notice or knowledge that he had been declared a habitual traffic offender.

The elemental instruction directed the jury to find both that the defendant drove "at a time when his driving privilege was revoked as a result of his classification by the Division of Motor Vehicles as a Habitual Traffic Offender" and that "the defendant had knowledge of such revocation." The permissive inference instruction given to the jury in-

formed it that it may, but was not required to, find the fact of knowledge from various predicate facts, and that the jury "may consider [such] evidence, together with all the other evidence in this case, in determining whether or not the defendant had knowledge of the habitual traffic revocation." Because the jury was not given a specific definition of "knowledge," we assume that it construed that word according to its commonly understood meaning. Thus, the verdict in this case reflects that the jury found that the defendant drove with knowledge, *as that term is commonly understood*, that his license to drive was under revocation because he had been declared a habitual offender.

Therefore, the question we must determine is whether the verdict of guilty in this case is surely not attributable to any difference that may exist between the common understanding of the word "knowledge" and our statutory definition of the culpable mental state of "knowingly." Put in other words, the question we must decide is whether our review of the record leads us to conclude beyond a reasonable doubt that the instructional error, that is, the failure to define "knowledge" as "knowingly" under section 18–1–501(6), did not contribute to the guilty verdict.

■■■ Resolution of this issue requires us to compare the common understanding of the word "knowledge" with the statutory definition of the culpable mental state of "knowingly." We consult definitions contained in recognized dictionaries to determine the ordinary meaning of words. *Union Ins. Co. v. Houtz*, 883 P.2d 1057, 1068 (Colo.1994). One such dictionary defines "knowledge" as "the act, fact, or state of knowing; ... awareness [or] understanding." *Webster's New World College Dictionary* 748 (3d ed.1996). Another dictionary defines "knowledge" as "an awareness or understanding of a fact or circumstance." *Black's Law Dictionary* 876 (7th ed.1999).

11. The sum of the evidence bearing on the defendant's knowledge of the fact that his license was under restraint is as follows: When arrested the defendant stated that he knew that he should not have been driving. The notice of revocation was mailed to the address given by the defendant to the division of motor vehicles and the return receipt was signed by his mother. The defendant did not live at this address but did receive mail there, although he did not have a specific mail slot. There was no testimony presented that the defendant was either served personally with the notice of revocation or that someone told him of his revocation.

As noted, "knowingly" under Colorado's statute is a broad concept that may attach to conduct, "when [a person] is aware that his conduct is of such a nature," to a circumstance, "when [a person] is aware ... that such circumstance exists," or to a result, "when [a person] is aware that his conduct is practically certain to cause the result." *Derrera*, 667 P.2d at 1367. With respect to the contested issue of notice here, we are concerned only with the more limited definition of knowingly—whether the defendant was aware that a circumstance, his revocation, existed.

■■■ In the context of this case, we perceive no meaningful difference between the dictionary definitions of "knowledge" and the limited statutory definition of "knowingly" that might have affected the jury's understanding of "knowledge" as it applied to the issue of actual notice in this case. It would strain credulity for us to conclude that the jury's finding on the issue of notice is attributable to the fact that it found that the defendant acted with "an awareness or understanding" of the revocation (the ordinary meaning) rather than finding that he "was aware" of that circumstance (the broader culpable mental state definition).

The defendant argues that because the instructions given to the jury did not state that the jury had to find the defendant had actual knowledge of the revocation, the jury might have convicted the defendant based only on a finding that he had constructive knowledge of the revocation. We find this argument unconvincing. While the jury instructions did not use the term actual knowledge, both parties made it clear to the jury in their closing arguments that the jury had to find that the defendant actually knew his license was under revocation for being a habitual offender to convict.

For these reasons, we conclude that the guilty verdict rendered in this trial was surely unattributable to the difference between the common understanding of the word "knowledge" and Colorado's statutory definition of that culpable mental state. Hence, we hold that the trial court's instructional error in this case was harmless beyond a reasonable doubt.

## IV. CONCLUSION

Hence, we affirm the judgment of the court of appeals.