**The PEOPLE of the State of Colorado,**
**Plaintiff–Appellee,**

v.

**Mark Anthony MONTEZ,**
**Defendant–Appellant.**

No. 07CA0139.

Colorado Court of Appeals,
Div. I.

March 18, 2010.

John W. Suthers, Attorney General, Ryan A. Crane, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Elizabeth Griffin, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge HAWTHORNE.

Defendant, Mark Anthony Montez, appeals the judgment of conviction entered on jury verdicts finding him guilty of two first degree burglary counts, two possession of a weapon by a previous offender counts, one theft count, and six habitual criminal counts based on prior felony convictions. We affirm the convictions and remand the case for the court to correct the mittimus because we conclude that the burglary convictions merge.

## I. Factual Background

The following facts, viewed in the light most favorable to the prosecution, were established at trial. Defendant broke a home's back window, entered and ransacked the residence, and fled with approximately $150 and a gun case containing two unloaded shotguns.

## II. *Batson* Challenge

Defendant contends that reversal is required because the trial court failed to conduct a proper analysis under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90

L.Ed.2d 69 (1986). We discern no basis for reversal.

## A. Background

Apparently relying on *Batson*, defendant objected after the prosecution used peremptory challenges to excuse the only two jury panel members with Hispanic surnames. The prosecutor stated he excused one member because, in response to a question about who her hero was, she chose herself. He found her answer "very odd and eccentric . . . and [it] did not go to the values that [he] thought would make a good juror." The prosecutor explained that he excused the second panel member because she "exhibited very poor body language in response to questions about reasonable doubt . . . [and] was shaking her head with the defense." He further opined that she appeared Caucasian and might be married to someone with a Hispanic surname.

After the court asked defense counsel whether he "would . . . like to follow-up," he responded that it was inappropriate to ask about a panel member's race. He further stated that she "looked Hispanic to [him]," reiterated that the prosecutor excused the only two Hispanics on the jury panel, and emphasized that defendant is also Hispanic.

The court observed that the prosecutor used peremptory challenges to strike the only two jury panel members with Hispanic surnames and noted that defendant also has a Hispanic surname. However, it concluded, "I do not find that two people make a *Batson* challenge. [The prosecutor] has given us no race-related reasons for that."

## B. Law

Trial courts must apply a three-step process in evaluating a *Batson* challenge. *See People v. Robinson*, 187 P.3d 1166, 1172 (Colo.App.2008). First, the party opposing the challenge must make a prima facie case of racial discrimination. Second, if the opponent meets that requirement, the burden of production shifts to the challenge's proponent to offer a race-neutral explanation. Third, if the proponent meets that burden, the opponent must have the opportunity to rebut the prosecutor's explanation, and the trial court must determine whether the opponent has proved purposeful racial discrimination. *Id.; People v. Vieyra*, 169 P.3d 205, 211 (Colo.App.2007). "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Robinson*, 187 P.3d at 1172 (quoting *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)).

We review de novo a trial court's rulings on the inquiry's first and second steps, and we defer to its ultimate resolution in step three, reversing only for clear error. *Vieyra*, 169 P.3d at 211.

## C. Analysis

■ Contrary to defendant's interpretation, we read the trial court's statement, "I do not find that two people make a *Batson* challenge," to mean that the court, after conducting a three-step analysis, did not find that the two panel members were challenged for discriminatory reasons. The court made a specific factual finding, not a general legal conclusion. *See People v. Collins*, 187 P.3d 1178, 1184 (Colo.App.2008) ("[t]he striking of a single potential juror for a discriminatory reason violates the Equal Protection Clause"). We discern no basis for reversal because the trial court conducted a *Batson* analysis and concluded that defendant had not carried his burden to prove purposeful racial discrimination.

First, defendant offered his reasons for objecting to the prosecutor's peremptory challenges. Next, the prosecutor proffered race-neutral explanations for exercising the challenges. In response to the court's invitation to "follow up," defendant essentially repeated his objection that the two challenged jurors were the "only two Hispanic people on the jury panel" but did not offer any other proof of purposeful racial discrimination. When the trial court found that two people do not make a *Batson* challenge and stated, "[the prosecutor] has given us no race-related reasons for [the peremptory challenges]," it engaged in the third step of its *Batson* analysis. Having heard the prosecutor's race-neutral explanation, and defendant's rebuttal, the court concluded that the explana-

tion was credible and defendant did not prove that the challenges were racially motivated.

Because step three involves determining credibility, the trial court is in a superior position to evaluate whether discrimination occurred, and absent clear error we will not substitute our judgment for the trial court's. *See Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) (trial court has pivotal role in evaluating *Batson* claims because the inquiry's third step involves evaluating the prosecutor's credibility, often discriminatory intent is best evidenced by the challenging attorney's demeanor, and race-neutral reasons for peremptory challenges frequently also invoke a juror's demeanor). We therefore conclude that the trial court did not clearly err in determining that defendant had not proved purposeful racial discrimination.

### III. Evidence's Sufficiency

Defendant next contends that his first degree burglary convictions must be vacated because there was insufficient evidence that he was "armed" with a deadly weapon. We disagree.

### A. Law

Appellate courts review de novo whether the evidence, viewed in the light most favorable to the prosecution, was "sufficient in both quantity and quality to sustain the convictions." *Dempsey v. People*, 117 P.3d 800, 807 (Colo.2005). It is the prosecution's burden to establish a prima facie case of guilt, which requires it to introduce "sufficient evidence to establish guilt—no more, no less." *Id.* (quoting *People v. Bennett*, 183 Colo. 125, 130, 515 P.2d 466, 469 (1973)). The evidence must be both "substantial and sufficient to support a conclusion by a reasonable mind that [the] defendant is guilty of the charge beyond a reasonable doubt." *Bennett*, 183 Colo. at 130, 515 P.2d at 469. The court must give full consideration to the jury's right to draw all justifiable factual inferences from the evidence. *Id.* The fact finder determines the evidence's weight. *People v. McIntier*, 134 P.3d 467, 471 (Colo.App.2005). An appellate court cannot sit as a thirteenth

juror and set aside a verdict simply because it could have reached a different conclusion. *Id.* Where "reasonable minds could differ, the evidence is sufficient to sustain a conviction." *People v. Rector*, 226 P.3d 1170, 1176 (Colo.App.2009).

We therefore examine the evidence here to determine whether it reasonably satisfies the definition of "armed" to support the jury's first degree burglary verdicts.

### B. Analysis

■ "A person commits first degree burglary if the person knowingly enters unlawfully ... in a building or occupied structure with intent to commit therein a crime ... and if in effecting entry or while in the building or occupied structure or in immediate flight therefrom, the person ... is armed with ... a deadly weapon." § 18–4–202(1), C.R.S.2009. An unloaded shotgun is a deadly weapon. *See* § 18–1–901(3)(e)(I), C.R.S. 2009. The term "armed" is not defined by statute; however, Colorado case law requires that the deadly weapon must be "easily accessible and readily available for use by the defendant for either offensive or defensive purposes." *People v. Loomis*, 857 P.2d 478, 482 (Colo.App.1992) (quoting *State v. Hall*, 46 Wash.App. 689, 732 P.2d 524, 528 (1987)).

Here, the evidence showed that defendant removed a gun case containing two unloaded shotguns from the home. Witnesses testified that the gun case resembled a guitar case. There was no ammunition in the case, nor was any found on defendant's person. The evidence included two photographs of the gun case; one showing the case open with the two shotguns inside it and the other showing the case closed. Neither photograph revealed a lock or locking mechanism on the case, and there was no other evidence that the case was locked or otherwise rendered difficult or impossible to open while in defendant's possession.

Considering this evidence in the light most favorable to the prosecution, we conclude that the jury could reasonably have inferred that opening the case and making the shotguns available could have been accomplished reasonably quickly and would be no more

difficult or time-consuming than accessing an unlocked guitar case's contents. Accordingly, we conclude that there was sufficient evidence to support a jury conclusion, beyond a reasonable doubt, that the deadly weapons were easily accessible and readily available for use by defendant.

We reject defendant's assertion that *People v. Moore*, 841 P.2d 320 (Colo.App.1992), requires a different conclusion. The division in *Moore* did not rely on the term "armed" as meaning "easily accessible and readily available for use" as adopted in *Loomis*. *See Loomis*, 857 P.2d at 482; *Moore*, 841 P.2d at 322-23. Although the *Moore* division noted that the defendant had not removed the weapons from a canvas sack, it did not decide whether the weapons were easily accessible and readily available. Instead, the division apparently relied on other statutory language as requiring that one must threaten another with the weapon to be guilty of first degree burglary. *See Moore*, 841 P.2d at 323. We agree with the *Loomis* division and decline to follow *Moore*. *See Loomis*, 857 P.2d at 481 (under the "easily accessible and readily available" test, it is not necessary to analyze a defendant's willingness or present ability to use the firearm).

We also reject defendant's argument to the extent it asserts *Loomis* holds that deadly weapons enclosed in containers or otherwise limited in access are necessarily not easily accessible and readily available for use. *See Loomis*, 857 P.2d at 482. The division's statement in *Loomis* that the stolen firearms carried by the defendant "were not enclosed in containers or otherwise limited in access" merely bolsters its conclusion that the weapons were "*clearly* easily accessible and readily available for use by the defendant." *Id.* (emphasis added). In this case, we have concluded that the jury could have reasonably determined that the shotguns were easily accessible and readily available to defendant even though they were encased and thus, limited in access.

We further conclude that *State v. Brown*, 162 Wash.2d 422, 173 P.3d 245 (2007), relied on by defendant, is inapposite. There, the court's analysis is based on "[r]equiring both that the weapon be readily available and

easily accessible, as well as a nexus based on the facts of the case, [to] limit[ ] the definition of being armed to those situations the statutes are aimed at controlling." *Id.* at 251. Our case law does not require a nexus between the crime and the weapon. *Id.* at 250; *cf. Loomis*, 857 P.2d at 482.

Finally, we reject defendant's argument that he was not armed with a deadly weapon because the guns lacked ammunition. The statutory definition of "deadly weapon" includes "a firearm, whether loaded or unloaded." § 18-1-901(3)(e)(I). " 'Firearm' means any ... shotgun ... capable or intended to be capable of discharging bullets ...." § 18-1-901(3)(h), C.R.S.2009. Moreover, an unloaded firearm can be used for offensive or defensive purposes.

Because there is sufficient evidence establishing that defendant was armed with a deadly weapon, we affirm defendant's first degree burglary convictions subject, however, to the merger analysis below.

## IV. Merger

Defendant contends that his burglary convictions merge and his possession of a weapon by a previous offender (POWPO) convictions also merge. We conclude that defendant's two burglary convictions merge but not his two POWPO convictions.

### A. Burglary

Defendant contends, the People concede, and we agree that his burglary convictions merge. *See People v. Denton*, 91 P.3d 388, 392 (Colo.App.2003) (trial court erred by entering more than one conviction based on identical evidence). Thus, we remand to the trial court to correct the mittimus.

### B. POWPO

Defendant was charged and convicted of two POWPO counts because he possessed two shotguns removed from the home and had a prior felony menacing conviction within the prior ten years.

### 1. Law

Section 18–12–108(1), C.R.S.2009, provides, "A person commits the crime of possession of a weapon by a previous offender if the person knowingly possesses, uses, or carries upon his or her person a firearm ... subsequent to the person's conviction for a felony...."

■ Whether a defendant may receive a separate POWPO conviction for each firearm he possesses involves statutory interpretation subject to de novo review. *See Leyva v. People*, 184 P.3d 48, 50 (Colo.2008).

### 2. Analysis

The United States' and Colorado Constitutions' Double Jeopardy Clauses do not prohibit imposing multiple punishments for committing a single act where the General Assembly clearly intends to punish the same offense with more than one conviction and sentence. *People v. Abiodun*, 111 P.3d 462, 465 (Colo.2005).

■ Whether particular acts were committed is a factual question. Whether different acts constitute more than one offense and whether sufficient evidence exists to support multiple offenses are legal matters. If each legally distinct offense was charged with sufficient specificity to distinguish it from other offenses and there was sufficient evidence produced at trial to support convictions of each charge, general verdicts of guilt will be adequate to support multiple convictions. *Id.* at 471; *People v. Mintz*, 165 P.3d 829, 833 (Colo.App.2007).

■ In this analysis, we must determine whether the unit of prosecution prescribed by the legislature permits charging multiple offenses. *Quintano v. People*, 105 P.3d 585, 590 (Colo.2005). The unit of prosecution is the manner in which a criminal statute permits the defendant's conduct to be divided into discrete acts for prosecuting multiple offenses by establishing whether the conduct consists of one or more violations of a single statutory provision. *Mintz*, 165 P.3d at 833.

In interpreting section 18–12–108(1)'s language, our primary task is to give effect to the legislature's intent. *Id.* We begin with the statute's language and its plain meaning, which we consider within the whole statute's context. *Id.; Romanoff v. State Comm'n on Judicial Performance*, 126 P.3d 182, 188 (Colo.2006). Under the statute, a convicted felon "commits the crime" when he "knowingly possesses ... a firearm." The phrase "a firearm" indicates that each firearm constitutes a separate statutory violation. *See* § 18–12–108(1). Thus, the statute's plain meaning supports imposing separate convictions for each firearm possessed.

By contrast, the federal counterpart to section 18–12–108(1) makes it "unlawful" for a convicted felon to possess "*any* firearm." 18 U.S.C. § 922(g), 2009 (emphasis added). The word "any" creates an "unlimited, non-restricted phrase." *Woellhaf v. People*, 105 P.3d 209, 216 (Colo.2005). Thus, the federal statute only authorizes one conviction for possessing multiple firearms. *See, e.g., United States v. Hodges*, 315 F.3d 794, 798–99 (7th Cir.2003) (sufficient evidence to support defendant's conviction of one count of "being a felon in possession of firearms" upon proof that he received four guns). If the Colorado General Assembly had intended for only one conviction to enter regardless of how many firearms an offender possessed, it would have done so clearly, for example, by using the language employed in the federal statute.

Moreover, the statute's purpose is to "limit the possession of firearms by those who, by their past conduct, have demonstrated an unfitness to be entrusted with such dangerous instrumentalities." *People v. Gallegos*, 193 Colo. 108, 110, 563 P.2d 937, 939 (1977) (quoting *People v. Trujillo*, 178 Colo. 147, 150, 497 P.2d 1, 2–3 (1972)). Punishing possession of each weapon as a separate conviction effectuates this purpose. Thus, we conclude that each weapon possessed separately violates the statute and subjects the offender to a separate conviction. *See Robinson*, 187 P.3d at 1169 (affirming, without analyzing this issue, defendant's two POWPO convictions where two firearms were found in his vehicle).

### V. POWPO Felony Classification

Defendant contends his two POWPO convictions must be reduced from class five to class six felonies. We disagree.

## A. Law

POWPO is a class six felony, but it is a class five felony if committed within ten years of a conviction for a "felony involving the use of force or the use of a deadly weapon." § 18–12–108(2)(a), (c), C.R.S.2009.

## B. Analysis

### 1. Use of Force

■ Defendant argues that felony menacing, the felony offense of which he was previously convicted, is not a "felony involving the use of force or the use of a deadly weapon" under section 18–12–108(2)(c). We disagree.

Statutory interpretation issues are legal questions subject to de novo review. *See People v. Martinez*, 780 P.2d 560, 561 (Colo. 1989) (whether trial court correctly defined term "possess" was legal question).

Section 18–3–206(1) provides:

A person commits the crime of menacing if, by any threat or physical action, he or she knowingly places or attempts to place another person in fear of imminent serious bodily injury. Menacing ... is a class 5 felony if committed:

(a) By the use of a deadly weapon or any article used or fashioned in a manner to cause a person to reasonably believe that the article is a deadly weapon; or

(b) By the person representing verbally or otherwise that he or she is armed with a deadly weapon.

Our case law defines force to include "actual, applied physical force" and "compulsion by threatened violence." *Gallegos*, 193 Colo. at 110, 563 P.2d at 938–39. Because felony menacing is committed when a person knowingly places or attempts to place another in fear of imminent serious bodily injury by using or threatening use of a deadly weapon, it necessarily involves the threat of force. Thus, a POWPO conviction entered within ten years after a felony menacing conviction is a class five felony. *See id.* (attempted robbery by threat to blow up another's property is a felony that involves using force or violence under prior POWPO statute); *see also People v. Jenkins*, 198 Colo. 347, 349, 599 P.2d 912, 913 (1979) ("robbery involving only the use of intimidation is a felony involving the use of force or violence" under prior POWPO statute).

### 2. Evidence's Sufficiency

Defendant maintains that his class five felony POWPO conviction should be reduced to a class six felony because the evidence was insufficient to allow the jury to determine whether he used a deadly weapon in committing the prior felony menacing offense. We are not persuaded.

■ Whether the evidence was sufficient to support the jury's finding that defendant used a deadly weapon when he committed menacing is reviewed de novo. *Dempsey*, 117 P.3d at 807.

As discussed above, felony menacing is, by definition, a felony that involves using force and therefore triggers a POWPO conviction's enhancement when committed within the prescribed time frame. Because felony menacing is per se a felony that involves using force, the enhancement here did not depend on the jury finding that defendant actually used force or a deadly weapon in committing the prior felony menacing offense.

### 3. Jury Instructions

■ Defendant contends that the trial court committed reversible error by failing to provide written instructions to the jury stating that it had to unanimously and beyond a reasonable doubt find that his prior conviction was a felony involving the use of force or a deadly weapon to find him guilty of a class five felony under the POWPO statute. We discern no basis for reversal.

■ Where a defendant preserves objection to a trial court's failure to properly instruct the jury, harmless error review applies. *Griego v. People*, 19 P.3d 1 (Colo. 2001).

Although the POWPO verdict form and written jury instructions here did not include burden of proof and detailed unanimity instructions, the jury was adequately informed concerning proof beyond a reasonable doubt and juror unanimity requirements. Defense counsel discussed proof beyond a reasonable

doubt at length in his closing. Additionally, the jury was provided detailed written burden of proof and unanimity instructions earlier that same day when it deliberated on the burglary and theft charges. The trial court also provided oral instructions informing the jury that its verdict must be unanimous and that the prosecution bore the burden of proving the charges beyond a reasonable doubt. Thus, we conclude that any error in the written jury instructions did not contribute to the verdict. *See People v. Pahlavan,* 83 P.3d 1138, 1142 (Colo.App.2003) (we presume jury understood and heeded court's instructions).

Defendant also asserts that the special finding verdict form requiring the jury to determine whether "the previous conviction involve[d] the use of force or the use of a deadly weapon" "broadened the grounds for conviction by misstating the statutory element." The form omitted the term "felony" and referred to the previous "conviction." However, because felony menacing is, by definition, a felony, any error was harmless.

## VI. Conclusion

Defendant's judgment of conviction is affirmed and the case is remanded to the trial court to correct the mittimus by merging the first degree burglary convictions.

Judge FURMAN concurs.

Judge TAUBMAN specially concurs.

Judge TAUBMAN specially concurring.

Although I agree with the majority's analysis and, in particular, its conclusion that the trial court properly rejected defendant's challenge to two Hispanic potential jurors under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), I write separately to express my concern regarding the need for more careful litigation of this issue by the parties and more complete findings by the trial court.

The use of peremptory challenges to purposefully discriminate against jurors of a protected class violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *J.E.B. v. Ala-*bama *ex rel. T.B.,* 511 U.S. 127, 146, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); *Batson,* 476 U.S. at 87, 89, 106 S.Ct. 1712; *People v. Robinson,* 187 P.3d 1166 (Colo.App.2008). As the majority correctly notes, trial courts must apply a three-step process in evaluating a *Batson* challenge.

First, the party objecting to the exercise of the challenge must make a prima facie showing that the other party excluded a potential juror because of race. Second, if the objecting party establishes a prima facie case, the burden shifts to the proponent of the strike to come forward in the second step with a race-neutral explanation for the challenge. Third, if a race-neutral reason is articulated, the trial court must determine whether the opponent of the strike has nonetheless proved purposeful racial discrimination. *People v. Vieyra,* 169 P.3d 205, 210 (Colo. App.2007).

As part of this third step, the opponent must have the opportunity to rebut the proponent's race-neutral explanation by showing, for example, that it is a pretext. Finally, the court must then determine, on the basis of all the evidence before it, whether it can find by a preponderance of the evidence that one or more potential jurors were excluded because of race. *Id.* at 210–11.

We review de novo a trial court's rulings on steps one and two of the analysis, and we review the trial court's resolution of a *Batson* objection in step three for clear error. *Id.* at 211.

Here, defendant's *Batson* challenge was raised in such an informal manner that meaningful appellate review is difficult. At no time during defendant's *Batson* challenge did defendant, the prosecutor, or the trial court refer to the *Batson* case. Defense counsel, the prosecutor, and the trial court did not acknowledge the above-described three-step process for making a *Batson* challenge.

When defendant objected to the prosecutor's striking the only two jury panel members with Hispanic surnames, the trial court did not determine whether this showing by defendant established a prima facie case. Similarly, defendant did not argue that he

had established a prima facie case, nor did the prosecutor concede that defendant had established a prima facie case.

Instead, the prosecutor immediately began explaining the reasons that he believed were race-neutral for striking the two Hispanic jurors. Following this explanation, which was apparently intended to satisfy step two of the *Batson* process, the trial court did not rule on whether these explanations were race-neutral. Similarly, the prosecutor did not ask the trial court to determine that his proffered reasons for striking the Hispanic jurors were race-neutral. Defense counsel did not comment on this point, either.

Next the trial court asked defense counsel if he would like to follow up. As the majority notes, defense counsel responded that it was inappropriate to ask about a panel member's race and reiterated that the prosecutor had excused the only two Hispanics on the jury panel. Defense counsel noted that this was significant because defendant is also Hispanic. At no time did defendant contend that the prosecutor's asserted race-neutral reasons were pretextual.

Following this exchange, the trial court rejected defendant's *Batson* challenge, asserting two reasons. It concluded, "I do not find that two people make a *Batson* challenge. [The prosecutor] has given us no race related reasons for that."

Thus, in effect, the parties and the trial court collapsed the three-step *Batson* procedure into a one-step process. As a result, the trial court's reasons for denying defendant's *Batson* challenge are indeed troubling. The trial court's first statement—"I do not find that two people make a *Batson* challenge"—is a legally incorrect statement if viewed as the trial court's ruling on whether defendant established a prima facie case. *See People v. Collins,* 187 P.3d 1178, 1184 (Colo.App.2008) (the striking of a single potential juror for a discriminatory reason violates the Equal Protection Clause).

Under these circumstances, it is possible to conclude, as the majority does, that the trial court intended to state that after considering the prosecutor's asserted race-neutral reasons for striking the two Hispanic jurors,

defendant's *Batson* challenge was not successful. To reach this conclusion, however, one must try to infer what the trial court meant, rather than evaluate what the trial court actually said.

I am further concerned by the trial court's second reason for rejecting defendant's *Batson* challenge—that the prosecutor "has given us no race-related reasons for that." On its face, this conclusion is a determination of the second step of the *Batson* process—has the prosecutor offered race-neutral reasons for striking the jurors in question? If the trial court's second reason was responsive to the second step of the *Batson* test, one is left with the conclusion that the trial court did not rule on the third step of defendant's *Batson* challenge. As noted, that step requires the trial court to determine whether the prosecutor's asserted race-neutral grounds for striking potential jurors are valid or are a pretext for racial discrimination. In my view, the trial court was required to state whether it had found the prosecutor's asserted race-neutral reasons credible and not pretextual. The importance of such a finding by the trial court was underlined by the United States Supreme Court decision in *Snyder v. Louisiana,* 552 U.S. 472, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008).

There, the prosecutor articulated two race-neutral reasons for exercising a peremptory challenge against an African–American potential juror. Concluding that the prosecutor's second reason was pretextual and that the trial court judge had not made an express determination regarding the prosecutor's first reason—the potential juror's demeanor—the Supreme Court refused to presume the judge credited that reason. Thus, the court concluded the adverse inference created by the use of the pretextual reason was not overcome by the first reason, and reversed the defendant's conviction. *Snyder,* 552 U.S. at 479, 128 S.Ct. 1203; *see also Collins,* 187 P.3d 1178 (reversing defendant's conviction because at least three of the race-neutral reasons articulated by the prosecutor were affirmatively refuted by the record and the district court did not specifically credit the others).

Here, as in *Snyder* and *Collins,* the trial court did not specifically credit the prosecu-

**18**

tor's articulated race-neutral reasons with respect to either Hispanic-surnamed juror. Because the trial court did not make specific findings with respect to the prosecutor's asserted reasons for striking the Hispanic-surnamed jurors, we cannot know whether the trial court was satisfied with the prosecutor's explanations.

This lack of specific credibility findings is troublesome to me because, with respect to the second Hispanic juror, the prosecutor, in addition to offering two arguably valid race-neutral reasons, then explained that he was not sure that the second Hispanic-surnamed juror was indeed Hispanic. In my view, this additional explanation was problematic and possibly pretextual, because *Batson* protects not only against challenges to Hispanics, but against challenges to Spanish-surnamed individuals as well. *Fields v. People*, 732 P.2d 1145, 1153 (Colo.1987) (holding that Spanish-surnamed people constitute a cognizable group for the purpose of Sixth Amendment and Equal Protection Clause claims against the use of peremptory challenges); *see also Washington v. People*, 186 P.3d 594, 601 (Colo.2008).

As with the lack of input by defense counsel and the prosecutor with regard to the first step of *Batson*, the same is true with regard to the third step. Neither defense counsel nor the prosecutor requested that the trial court make specific credibility findings, as is required under step three of the *Batson* process.

For the reasons set forth by the majority, I conclude that the record is sufficient to uphold the trial court's denial of defendant's *Batson* challenge in this case. However, I would feel more confident in reaching this conclusion had defense counsel, the prosecutor, and the trial court specifically followed the dictates of *Batson*. Because *Batson* involves the vindication of important constitutional rights for defendants in criminal cases, I believe that litigation of such issues demands more of all concerned than was done in this case.