The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
August 5, 2021

## 2021COA104

**No. 19CA1772, *People v. Stone* — Constitutional Law — Fourth Amendment — Searches and Seizures — Warrantless Search — Consent Exception**

A division of the court of appeals considers for the first time whether an occupant's consent to a law enforcement officer's entry into his or her home extends to the officer's re-entry into the home after the officer has briefly left it. The division concludes that, where the initial entry and the re-entry are closely related in time and purpose, the initial consent extends to the subsequent re-entry.

COLORADO COURT OF APPEALS **2021COA104**

Court of Appeals No. 19CA1772
Jefferson County District Court No. 18CR3901
Honorable Jeffrey R. Pilkington, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Adrienne Marie Stone,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE LIPINSKY
Román and Davidson*, JJ., concur

Announced August 5, 2021

Philip J. Weiser, Attorney General, Rebecca A. Adams, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Scott Poland, Alternate Defense Counsel, Lakewood, Colorado, for Defendant-
Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2020.

¶ 1    The Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution protect individuals against unreasonable searches and seizures. Unless one of the exceptions to the search warrant requirement applies, law enforcement officers are barred from entering a person's home without a warrant. One of those exceptions applies when a person with authority over the home freely and voluntarily consents to the law enforcement officer's entry into the home. This case addresses the scope of that consent.

¶ 2    We consider in this case a novel issue of Colorado law — whether an occupant's consent to a law enforcement officer's entry into the occupant's home extends to the officer's re-entry into the home after the officer has briefly left it, where the initial entry and the re-entry are closely related in time and purpose, and the occupant did not revoke or limit the initial consent. We conclude that, under these circumstances, the occupant's initial consent extends to the officer's re-entry into the home.

¶ 3    Adrienne Marie Stone appeals her judgment of conviction based on her contention that the court erred by admitting evidence obtained during an illegal search of her house. We affirm.

1

## I. Background Facts

### A. The Officers' Entry into Stone and N.M.'s House

¶ 4      Sergeant Betsy Westbrook of the Arvada Police Department responded to a report of a disturbance involving a seventeen-year-old, N.M., who said that Stone, his mother, had threatened him with a knife. Upon arriving at Stone and N.M.'s house, Westbrook spoke with N.M.'s sister, M.M., who was standing in front of the house. M.M. told Westbrook that, three days earlier, Stone had threatened N.M. with a knife. M.M. said that she was worried for N.M.'s safety because Stone was headed to the house, was very angry with N.M., and had told him to "pray for his life."

¶ 5      While speaking with M.M., Westbrook noticed that a young man holding a baby briefly opened the front door of the house and then closed it. Suspecting that the young man was N.M., Westbrook knocked on the door. N.M. opened the door, agreed to speak with Westbrook, and identified himself. Westbrook asked N.M. whether she could speak with him inside the house. N.M. responded affirmatively and expressly invited her inside.

¶ 6      Upon entering the house, Westbrook observed a stairway filled with boxes, clothing, and other items that "block[ed] free

movement." In addition, she saw that the kitchen and living room were cluttered and that a young child was "crawling over" a baby gate set up between the living room and kitchen. Westbrook said that the child "could just climb up on different things and get over [the baby gate] easily."

¶ 7 N.M. led Westbrook into the kitchen, where he showed her a knife that he said Stone had used to threaten him. Westbrook took two photographs of the knife with her cell phone. She then left the house to retrieve her department-issued camera from her car so she could take better pictures of the interior of the house than she could with the cell phone.

¶ 8 As she stepped outside the house, Westbrook saw that Stone had arrived. Stone was upset that a police officer and M.M. were at the house. Stone also appeared to be yelling at a neighbor. Because the situation involving Stone was "rapidly unfolding," Westbrook re-entered the house without her camera.

¶ 9 Blaine Engdahl, a resource officer at N.M.'s school, also arrived at the house. After speaking briefly with M.M., Engdahl saw N.M. at the front door. He entered the house with N.M. and, like Westbrook, observed the clutter inside the house. Engdahl noted

that "[t]he movement through the house was by pathways through the clutter," which extended "up the stairs to the second floor."

¶ 10　After Westbrook and Engdahl spoke with N.M. and saw the interior of the house, they returned outside, where Westbrook "made the decision to contact Jefferson County protection services" about the children. A caseworker from protection services, Misty Bogle, arrived and entered the house. Upon evaluating the condition of the house, Bogle concluded it was unfit for children and that the children needed to be removed from it.

¶ 11　While Bogle, Westbrook, and N.M. gathered the children's belongings, a code enforcement officer, Nicole Miller, and another police officer, Devoney Cooke, entered the house. Cooke photographed the interior of the house while she, Westbrook, and Miller walked through it together. Over the next couple of hours, other law enforcement officers also entered the house.

¶ 12　Stone was arrested and charged with one count of felony menacing, seven counts of child abuse, and one count of violation of a protection order that the neighbor had obtained against her. One of the counts of child abuse was later dismissed because N.M. was not under the age of sixteen at the time of the alleged abuse.

## B.    The Suppression Hearing and the Trial

¶ 13    Stone filed a pretrial motion to suppress evidence of the knife and the condition of the house, arguing that the "[l]aw enforcement [officers] conducted a warrantless search of [her] residence without probable cause and her consent," and that "all evidence obtain[ed] [from the search] should be suppressed."

¶ 14    The trial court conducted a hearing on the motion, at which Westbrook and Cooke testified.  At the hearing, Westbrook described her interactions with N.M., the condition of the house, and the photographs she took of the knife.  Westbrook did not testify that she took any photographs in the house other than those of the knife.  In addition, Cooke testified about her observations when she walked through the house.  Cooke said that, at Westbrook's direction, she photographed the interior of the house.

¶ 15    Following the hearing, the trial court entered an order finding that Westbrook's and Engdahl's initial entries into the house were lawful because N.M. voluntarily gave them consent to enter.  It concluded, however, that Bogle's, Cooke's, and Miller's entries (as well as these of any other officials) violated Stone's Fourth Amendment rights.  Thus, it excluded "all evidence secured through

such actions . . . includ[ing] all photographs taken during these entries."

¶ 16   At trial, Westbrook and Engdahl testified about their interactions with N.M. and the condition of the house. The jury found Stone guilty on all counts.

## II.   Analysis

### A.   Standard of Review

¶ 17   "Review of a trial court's suppression order presents 'a mixed question of law and fact.'" *People v. Peluso*, 2021 CO 16, ¶ 10, ___ P.3d ___, ___ (quoting *People v. Allen*, 2019 CO 88, ¶ 13, 450 P.3d 724, 728). We review the trial court's legal conclusions de novo and defer to the trial court's findings of fact that are supported by competent evidence in the record. *Id.*

¶ 18   If we conclude that the trial court erred, we next determine whether the error is of constitutional dimension. The admission of evidence in violation of a defendant's Fourth Amendment rights is a constitutional error. *See People v. Summitt*, 132 P.3d 320, 323 (Colo. 2006). We must reverse if the trial court made a constitutional error unless "the evidence properly received against a defendant is so overwhelming that the constitutional violation was

harmless beyond a reasonable doubt." *Bartley v. People*, 817 P.2d 1029, 1034 (Colo. 1991).

### B. Westbrook's Entry and Re-Entry into the House

¶ 19 Stone first contends that the trial court erred by admitting Westbrook's testimony about the clutter in the house and the photographs she took during her initial entry and re-entry into the house. Before we address this argument on the merits, however, we turn to the parties' disagreement regarding the specific photographs that the court held were inadmissible in its ruling on Stone's suppression motion.

### 1. The Photographs of the House

¶ 20 Stone argues that, at trial, the court erred by allowing the prosecutor to admit into evidence photographs that the court had ruled in its suppression order were inadmissible.

### a. The Pre-Trial Colloquy

¶ 21 On the first day of trial, the prosecutor asked the court to clarify its earlier ruling regarding the admissibility of photographs taken during the search. Although Westbrook did not say at the suppression hearing that she had taken any photographs inside the house other than the photographs of the knife, the prosecutor told

7

the court on the morning of trial that, during her initial entry and re-entry, Westbrook had also used her cell phone to take photographs of the interior of the house.  The prosecutor said that any photographs Westbrook took of the interior of the house were similar to the photographs that Cooke took inside the house.

¶ 22    Based on the prosecutor's representation that Westbrook had taken photographs depicting the interior of the house, defense counsel did not object to the admission of the photographs.  But the court nonetheless noted that Westbrook had not testified that she photographed the interior of the house.  The court said to the prosecutor, "I heard [Westbrook] just as you heard her on the stand.  I didn't get my camera.  I took a photograph of the knife."  The court said, "Maybe it was [Westbrook] just didn't explain it."  The prosecutor responded, "I think I did not explain that correctly."

¶ 23    At trial, the court admitted photographs of the inside of the house, as well as photographs of the knife.

b.    The Trial Court Erred by Admitting the Photographs of the Interior of the House

¶ 24    The transcript of the suppression hearing supports the court's original understanding that, while in the house, Westbrook

photographed the knife but not the interior of the house. At the hearing, Westbrook acknowledged that "the only photograph [I] took on the first entry was the knife." She did not mention taking any additional photographs after re-entering the house. Rather, at the suppression hearing, Cooke was the only witness who said she had taken photographs depicting the interior of the house — and the court later ruled that Cooke had entered the house unlawfully.

¶ 25    The prosecutor's "clarification" on the first day of trial that Westbrook, in fact, photographed the interior of the house was not evidence, and thus the trial court erred by treating it as such. *See Quest Servs. Corp. v. Blood*, 252 P.3d 1071, 1088 n.10 (Colo. 2011). This is especially true because the prosecutor's "clarification" contradicted Westbrook's testimony at the suppression hearing that the only photographs she took during her first entry into the house depicted the knife.

¶ 26    Further, the prosecutor contended that the photographs of the interior of the house were "similar" to photographs that Westbrook allegedly took — even though, at the suppression hearing, Westbrook never said she photographed the interior of the house. Moreover, the prosecutor did not establish at trial who took the

photographs of the interior of the house or, more generally, that Westbrook's alleged photographs of the interior of the house actually existed. Thus, based on the evidence presented at the hearing, we understand that Cooke took the photographs of the interior of the house that were admitted into evidence

¶ 27 We hold that the trial court erred by admitting the photographs of the interior of the house because the prosecutor did not introduce evidence establishing that Westbrook took any such photographs; Westbrook testified at the suppression hearing that, while in the house, she only photographed the knife; Cooke, however, said that she took photographs inside the house; and the trial court ruled that Cooke entered the house illegally.

    c.    Even Though the Trial Court Erred by Admitting the Photographs of the Interior of the House, the Error Was Harmless Beyond a Reasonable Doubt

¶ 28 Because we conclude that the trial court erred by admitting photographs obtained in violation of Stone's Fourth Amendment rights, we must determine whether the admission of the photographs was harmless beyond a reasonable doubt. *Bartley*, 817 P.2d at 1034.

¶ 29     When determining whether a constitutional error is harmless beyond a reasonable doubt, we should consider "(1) the importance of the [erroneously admitted] evidence to the [prosecution's] case; (2) whether the evidence is cumulative; and (3) the overall strength of the [prosecution's] case." *People v. Omwanda*, 2014 COA 128, ¶ 32, 338 P.3d 1145, 1150. The "inquiry is whether the jury's guilty verdict in this 'trial was surely unattributable to the error.'" *Id.* (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)).

¶ 30     Here, the error was harmless beyond a reasonable doubt because the improperly admitted photographs of the interior of the house were cumulative of Westbrook's testimony regarding her observations inside the house, which, as discussed below, *infra* Part II.B.2, was admissible.

¶ 31     At trial, Westbrook testified that the photographs depicting the interior of the house were consistent with her own observations. She testified that the house "was very cluttered[,] . . . dirty[,] . . . [and] unsafe." She noted that the house was unsafe because she observed piles of things that could fall on a child; a very young child almost falling over a baby gate and tripping over items scattered on

11

the floor; and "old dishes and food and . . . everything around [that] just was . . . a hazard to a small child."

¶ 32    The photographs of the interior of the house that the court admitted into evidence were cumulative because they did not add anything material to Westbrook's description of the cluttered and hazardous conditions she saw in the house. *See People v. Espinoza*, 989 P.2d 178, 182 (Colo. App. 1999). Because the photographs were cumulative of Westbrook's testimony, the trial court's error in admitting them could not have contributed to the jury's verdict and was therefore constitutional harmless error. *See Griego v. People*, 19 P.3d 1, 8 (Colo. 2001); *Omwanda*, ¶ 32, 338 P.3d at 1150.

    2.    The Photographs of the Knife and Westbrook's Trial Testimony

¶ 33    We next turn to Stone's argument that the trial court erred by admitting the photographs Westbrook took of the knife and her trial testimony regarding her observations of the interior of the house. Stone contends that the court should have excluded this evidence because Westbrook violated Stone's Fourth Amendment rights when she entered the house without Stone's consent.

¶ 34    The trial court concluded that N.M. "knowingly, voluntarily[,] and intelligently consented" to Westbrook's entry, and that N.M.'s

12

consent encompassed both Westbrook's initial entry and her re-entry after stepping outside the house to retrieve the camera from her car. Stone contends that this conclusion was in error because (1) N.M., as a minor at the time, lacked the authority to consent to a law enforcement officer's entry into the house; and (2) even if N.M. had the authority to consent to Westbrook's initial entry, his consent did not extend to Westbrook's re-entry into the house. We are not persuaded.

### a. The Consent Exception to the Warrant Requirement

#### i. Valid Consent

¶ 35 A warrantless entry into a person's home is presumptively unreasonable unless it falls within a recognized exception to the Fourth Amendment's warrant requirement. *People v. Stock*, 2017 CO 80, ¶ 15, 397 P.3d 386, 390. The prosecution carries "the burden of establishing that [a] warrantless search is . . . justified under one of the narrowly defined exceptions to the warrant requirement." *People v. Fuerst*, 2013 CO 28, ¶ 11, 302 P.3d 253, 256 (quoting *People v. Winpigler*, 8 P.3d 439, 443 (Colo. 1999)).

¶ 36 One exception to the warrant requirement is "[a] search conducted pursuant to consent freely and voluntarily given by a

person with 'common authority' over the [searched] premises."
*People v. Strimple*, 2012 CO 1, ¶ 20, 267 P.3d 1219, 1223. Consent
is voluntary if it is "the product of an essentially free and
unconstrained choice by its maker." *People v. Berdahl*, 2019 CO
29, ¶ 20, 440 P.3d 437, 442 (quoting *People v. Munoz-Gutierrez*,
2015 CO 9, ¶ 16, 342 P.3d 439, 444). "Conversely, a consensual
search is involuntary when police overbear the consenting party's
will and critically impair the party's 'capacity for
self-determination.'" *Munoz-Gutierrez*, ¶ 17, 342 P.3d at 444
(quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)).

¶ 37    When determining whether a person voluntarily consented to a
law enforcement officer's entry into a residence, "courts must apply
an objective test that takes into account the totality of the
circumstances and determines whether the defendant could
reasonably have construed the police conduct to be coercive."
*Berdahl*, ¶ 23, 440 P.3d at 442. A consenting person's youth is a
factor in determining the voluntariness of the person's consent.
*United States v. Gutierrez-Hermosillo*, 142 F.3d 1225, 1231 (10th
Cir. 1998). However, the fact that the person giving consent is a
minor does not necessarily preclude effective consent and is only

14

one factor within the totality of the circumstances a court must consider when determining whether the consent was voluntary. *Blincoe v. People*, 178 Colo. 34, 37, 494 P.2d 1285, 1286 (1972); *see United States v. Sanchez*, 608 F.3d 685, 690 (10th Cir. 2010). Other relevant factors include the consenting person's education, intelligence, and state of mind, and whether the person was aware that he or she was free to withhold consent. *Berdahl*, ¶ 23, 440 P.3d at 442.

### ii. Consent by a Co-Occupant

¶ 38 In certain circumstances, a co-occupant can validly consent to a search of the residence even though the law enforcement officers are investigating a different co-occupant. Co-occupants "have common authority [to consent to a search] where there is 'mutual use of the property by persons generally having joint access [to] or control [of the residence] for most purposes.'" *Peluso*, ¶ 13, ___ P.3d at ___ (quoting *United States. v. Matlock*, 415 U.S. 164, 171 n.7 (1974)). If one co-occupant is not present during the search, "the consent of one who possesses common authority over [the] premises . . . is valid as against the absent, nonconsenting person with whom

15

that authority is shared." *Fuerst*, ¶ 12, 302 P.3d at 256 (quoting *Matlock*, 415 U.S. at 170).

¶ 39    Even where the co-occupant lacks actual authority to consent to a search, he or she may still possess apparent authority to validate the search.  Under the apparent authority doctrine, "[a] warrantless search is . . . valid based upon the consent of a third party whom officers, at the time of the entry, reasonably believe to possess common authority over the premises, even if the person in fact does not [possess such authority]."  *Peluso*, ¶ 14, ___ P.3d at ___.  The apparent authority doctrine applies only when the consenting party lacked actual authority.  *Petersen v. People*, 939 P.2d 824, 830-31 (Colo. 1997).

¶ 40    When officers seek consent to search a jointly occupied residence, "a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant."  *Georgia v. Randolph*, 547 U.S. 103, 122-23 (2006).  In order to vitiate a co-occupant's consent, "(1) the objecting occupant must have been physically present on the premises as officers 'propose[d] to make a consent search'; and (2) the objecting occupant must have objected as officers 'propose[d] to

make a consent search.'" *Williams v. People*, 2019 CO 108, ¶ 35, 455 P.3d 347, 354 (quoting *Fernandez v. California*, 571 U.S. 292, 306 (2014)). "[I]f the objecting resident does not take part in the threshold colloquy between the officers and his co-occupant, he 'loses out,'" and the co-occupant's consent will validate the search. *Id.* at ¶ 1, 455 P.3d at 348 (quoting *Randolph*, 547 U.S. at 121).

### b. The Trial Court Did Not Err by Finding that N.M. Validly Consented to Westbrook's Entry into the House

¶ 41 Stone contends that N.M. "had no legal authority over the residence to give constitutionally valid third-party consent" because he was a minor at the time and Westbrook did not "reasonably inquire" regarding his authority. Stone also contends that, after being told that Stone was on her way to the house, Westbrook had a duty to wait for Stone to arrive and to ask her for permission to enter the house. Finally, Stone argues that Westbrook exceeded any consent N.M. gave her when she re-entered the house. We consider and reject each of these contentions.

#### i. N.M. Voluntarily Consented to Westbrook's Entry

¶ 42 As noted, "the fact that one is a minor does not necessarily preclude effective consent . . . ." *Blincoe*, 178 Colo. at 37, 494 P.2d

17

at 1286. Rather, age is one factor within the totality of the circumstances that a court can consider when determining whether a person voluntarily consented to a search. *Sanchez*, 608 F.3d at 690; *Gutierrez-Hermosillo*, 142 F.3d at 1231. At seventeen, N.M. was nearly a legal adult. Stone does not argue that he was impaired intellectually or in such a state of mind that he could not understand what Westbrook was asking. Moreover, Stone does not contend that Westbrook coerced N.M. into letting her into the house. N.M. knew Westbrook was a police officer because she identified herself as such and wore a uniform. *See Sanchez*, 608 F.3d at 690. For these reasons, we conclude that N.M. voluntarily gave Westbrook consent to enter the house.

ii. N.M. Had Actual Authority to Consent to Westbrook's Entry

¶ 43 We agree with the trial court that N.M. had actual authority to consent to Westbrook's entry. The record shows, and Stone does not deny, that N.M. resided in the house and had "joint access [to] or control [of it] for most purposes." *Peluso*, ¶ 13, ___ P.3d at ___ (quoting *Matlock*, 415 U.S. at 171 n.7). Very simply, the house was N.M.'s home. Thus, N.M., as a co-occupant, had actual authority to consent to Westbrook's entry into the house. *See id.* ("Where a

residence is jointly occupied by more than one person, the consent of one occupant with common authority over the premises is sufficient to permit a warrantless search.").

¶ 44    Because N.M. had actual authority to consent to Westbrook's entry into the house, Stone's reliance on *Illinois v. Rodriguez*, 497 U.S. 177 (1990), in support of her contention that Westbrook had a duty to reasonably inquire regarding N.M.'s authority, is misplaced. *Rodriguez* addressed an individual's apparent authority to consent to a law enforcement officer's entry into a residence.  Because actual authority and apparent authority are mutually exclusive, and N.M. had actual authority to consent to Westbrook's entry for the reasons explained above, the apparent authority doctrine does not apply here.  *See Petersen*, 939 P.2d at 831.

¶ 45    Westbrook also was not required to wait for Stone to arrive and to ask her for consent to enter the house.  Where a potentially objecting co-occupant is "nearby but not invited to take part in the threshold colloquy" regarding consent to search the premises, the potentially objecting co-occupant "loses out" and the present co-occupant's consent to the search controls.  *Williams*, ¶¶ 24, 35, 455 P.3d at 352, 354 (quoting *Randolph*, 547 U.S. at 121).  Although at

the time of Westbrook's initial entry into the house, Westbrook knew that Stone would soon be arriving at the house, Stone was not present and therefore could not object to the entry. Stone cites to no authority suggesting that police officers are required to obtain the consent of an absent co-occupant where another co-occupant with actual authority has already given valid consent to entry.

### iii. N.M.'s Initial Consent Extended to Westbrook's Re-Entry

¶ 46  We next address Stone's contention that Westbrook's re-entry into the house exceeded the scope of N.M.'s consent to her initial entry. Stone suggests that Westbrook, "after observing the condition [of the house] on the first entry, [was required] to secure a search warrant" before she could legally re-enter the house. We disagree.

¶ 47  Absent an objection to "subsequent, closely related entries and searches, after valid consent to an initial entry," the consenting person's "initial consent [can] extend[] to the subsequent entries." *Phillips v. State*, 625 P.2d 816, 818 (Alaska 1980). "[W]hile one consensual entry does not entitle a law enforcement official to return at any substantially later time, an officer's momentary exit . . . does not invalidate" an otherwise legal search or seizure.

20

*Commonwealth v. Moye*, 586 A.2d 406, 409 (Pa. Super. Ct. 1990).

Thus, for consent to encompass a subsequent re-entry, the entry

and re-entry must be closely related in time and purpose. *See*

*People v. Franklin*, 2016 IL App (1st) 140059, ¶ 17, 62 N.E.3d 1145,

1150 (The court observed that the officer "never abandoned his

investigation, relinquished control over the defendant's house, or

indicated an intent not to seize [the contraband]. He only briefly

interrupted his search to call for backup" and to speak to the

prosecutor. (quoting *People v. Logsdon*, 567 N.E.2d 746, 748 (Ill.

App. Ct. 1991))); *cf. United States v. McMullin*, 576 F.3d 810, 816

(8th Cir. 2009) (holding that consent to an initial entry does not

extend to a subsequent entry if the purpose of the initial entry has

been accomplished).

¶ 48    Westbrook had not completed her investigation when she

momentarily stepped out of the house to retrieve her camera. As

noted above, she wanted the camera so she could take more

accurate photographs than she could with her cell phone.

Westbrook's time out of the house was so brief that she did not

reach her car before she decided to re-enter. Importantly, there is

no evidence that N.M. revoked his consent or otherwise objected to Westbrook's re-entry into the house.

¶ 49     Based on this record, we conclude that N.M.'s consent to Westbrook's initial entry extended to her re-entry into the house. *See Phillips*, 625 P.2d at 818; *Franklin*, ¶ 17, 62 N.E.3d at 1150; *Moye*, 586 A.2d at 409. Because N.M. did not revoke his consent or object to Westbrook's re-entry, Westbrook was not required to ask N.M. for consent to re-enter the house. *See Phillips*, 625 P.2d at 818.

¶ 50     For these reasons, we conclude that the trial court did not err by finding that Westbrook's re-entry was lawful because it fell within the scope of the consent N.M. gave her when she first knocked on the door.

C.     Stone's Challenge to Engdahl's and Bogle's Testimony at Trial

¶ 51     Stone also appears to challenge the admissibility of Engdahl's trial testimony based on her contention that he entered the house illegally. But she does not provide any citations to the record or legal authority in support of her argument regarding Engdahl's testimony.

¶ 52    For these reasons, Stone's argument is undeveloped, and we do not address it on the merits. *See People v. Liggett*, 2021 COA 51, ¶ 53, ___ P.3d ___, ___ (acknowledging that appellate courts do not address undeveloped arguments).

¶ 53    But even if the argument were developed, because Engdahl's trial testimony regarding the interior conditions of the house was cumulative of Westbrook's testimony, Engdahl's testimony could not have contributed to the jury's verdict. Thus, any error in the admission of Engdahl's testimony would have been harmless beyond a reasonable doubt. *See Griego*, 19 P.3d at 8; *Omwanda*, ¶ 32, 338 P.3d at 1150.

¶ 54    Finally, Stone also appears to challenge the legality of Bogle's entry into the house. But the trial court excluded Bogle's testimony regarding her observations of the interior of the house. Stone does not point to any evidence admitted at trial regarding Bogle's observations of the condition of the house. Therefore, this issue is moot.

### III.    Conclusion

¶ 55    The judgment of conviction is affirmed.

JUDGE ROMÁN and JUDGE DAVIDSON concur.