23CA0113 Peo v Aragon 06-18-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0113
Otero County District Court No. 15CR147
Honorable Mike Davidson, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Edward L. Aragon,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE YUN
Grove and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 18, 2026

---

Philip J. Weiser, Attorney General, Alejandro Sorg Gonzalez, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Casey J. Mulligan, Alternate Defense Counsel, Boulder, Colorado, for Defendant-Appellant

¶ 1     Edward L. Aragon appeals the judgment of conviction entered after a jury found him guilty of first degree murder.  He contends that the district court erred by (1) violating his right to conflict-free counsel; (2) excluding alternate suspect evidence; (3) excluding evidence of police misconduct and another stabbing in the neighborhood; (4) denying his motion to disqualify the district attorney; (5) imposing an inadequate sanction for the destruction of evidence; and (6) limiting cross-examination of a witness.  He also contends that the cumulative effect of these errors deprived him of a fair trial.  We disagree with these contentions and therefore affirm the judgment.

## I.     Background

¶ 2     Aragon was charged with first degree murder after his girlfriend, the victim, was found stabbed to death in his grandparents' home.  Aragon had scratches on his arms and chest, and the victim had Aragon's DNA under her fingernails.  Police found bloody clothing belonging to Aragon in a plastic bag in the home.  At trial, Aragon's nephew testified that he saw Aragon and the victim arguing the night before her death, and a jailhouse informant testified that Aragon admitted committing the murder.

¶ 3    Aragon maintained that the police investigation was inadequate and that someone else had stabbed the victim to death. After two mistrials, a jury ultimately convicted him as charged, and the court sentenced him to life in prison without the possibility of parole.

## II.    Right to Conflict-Free Counsel

¶ 4    Aragon argues that the district court violated his right to conflict-free counsel by failing to advise him of the nature of defense counsel's conflict of interest and the risks associated with waiving conflict-free representation.  We disagree.

### A.    Additional Background

¶ 5    Six days before Aragon's first trial was set to begin, the prosecution filed a notice of a potential conflict between Aragon and defense counsel.  According to the notice, the jailhouse informant scheduled to testify against Aragon alleged that defense counsel had "made threats against [the informant] in an attempt to encourage him not to testify in the case."

¶ 6    At a hearing the next day — January 30, 2020 — defense counsel "categorically and adamantly" denied the informant's allegation but agreed that there was "a potential conflict" because

counsel's right to remain silent while under investigation was at odds with his ability to use the false allegation to impeach the informant's credibility. He explained:

> [I]f we are forced to proceed to trial next week, before these allegations are investigated, we will be forced to make a decision as to whether or not we utilize the impeachment that we have against [the informant], and that will be a direct conflict with our own personal interest in remaining silent based on our Fifth Amendment right to remain silent, based on the District Attorney's articulated suggestion that we be investigated for criminal charges.

¶ 7 Defense counsel then suggested the court had two choices: appoint alternate defense counsel, who could review "66,000 pages of discovery" and be ready for trial "in maybe a couple years," or grant a continuance until he was cleared of any wrongdoing regarding the informant. He told the court that he had "become very close to [Aragon] in the last five years" and that Aragon was willing to waive his speedy trial right to keep him on the case. He added that, if the court denied the continuance,

> we would have to move to withdraw. You don't want that. We don't want that. Mr. Aragon doesn't want that. But we are conflicted if we proceed to trial in the next two weeks.

¶ 8     Before ruling on defense counsel's request for a continuance, the district court obtained a waiver of Aragon's speedy trial right. During a colloquy with the court, Aragon confirmed that he (1) understood his speedy trial right; (2) heard defense counsel's discussion with the court; (3) discussed the issue with defense counsel; (4) wanted to waive his speedy trial right; (5) had sufficient time to consider his decision; (6) was not forced or pressured into that decision; (7) made the decision of his own free will; and (8) wanted defense counsel to continue representing him.

¶ 9     The court referred the jailhouse informant's allegation of misconduct to a special prosecutor and granted a continuance until the investigation was resolved.  After six months, the investigation concluded when the special prosecutor declined to prosecute defense counsel but cautioned that the investigation could reopen if any new evidence emerged.  Defense counsel then filed a notice of conflict, prompting the court to appoint independent counsel to advise Aragon.

¶ 10     At a hearing a month later, independent counsel opined that a conflict of interest existed because the special prosecutor's warning about reopening the investigation "ha[d] a pretty serious chilling

4

effect" that "could result in an appellate situation where there's a question about was something done and why not." Aragon told the court that, although it was a difficult decision, he believed he needed new counsel for the case to move forward. The court found that an actual conflict of interest existed and appointed alternate defense counsel to represent Aragon.

### B. Governing Law and Standard of Review

¶ 11    A defendant in a criminal case has a constitutional right to conflict-free counsel. *See* U.S. Const. amend. VI; Colo. Const. art. II, § 16; *People v. Deutsch*, 2020 COA 114, ¶ 14. "A conflict of interest exists when an attorney's ability to represent a client is materially limited by the attorney's own interests." *Deutsch*, ¶ 14.

¶ 12    "Conflicts are categorized as either actual or potential." *People v. Harlan*, 54 P.3d 871, 878 (Colo. 2002). "An actual conflict of interest is one that is real and substantial, and adversely affects counsel's performance, while a potential conflict of interest is one that is possible or nascent, and in all probability will arise." *Deutsch*, ¶ 16 (quoting *People v. Curren*, 228 P.3d 253, 258 (Colo. App. 2009)).

¶ 13    The distinction between actual and potential conflicts of interest affects whether waiver is required. *Curren*, 228 P.3d at 258. If the court finds that an actual conflict of interest is waivable, it must secure an express and valid waiver from the defendant. *Id.* For a defendant to validly waive conflict-free representation, "[t]he record must affirmatively show that the trial court fully explained the nature of the conflict and the difficulties defense counsel faced in his effective advocacy for the defendant." *People v. Martinez*, 869 P.2d 519, 525 (Colo. 1994).

¶ 14    In contrast, a potential conflict of interest may not require an express waiver, and "[i]n cases where the potential conflict of interest is remote, waiver may not be required at all." *Curren*, 228 P.3d at 258.

¶ 15    We review de novo whether an actual conflict of interest existed. *Deutsch*, ¶ 13.

## C.    Discussion

¶ 16    Aragon argues that (1) an actual conflict existed at the January 30 hearing, and (2) his waiver of his right to conflict-free counsel was invalid because the district court did not "fully explain the nature of the conflict or the difficulties counsel would face in

6

effectively advocating" for him. The People respond that the conflict at the time of the hearing was only a potential conflict. We agree with the People.

¶ 17  As defense counsel explained at the January 30 hearing, an actual conflict would arise only if (1) the jailhouse informant's allegations of his misconduct were deemed relevant and admissible at trial, and (2) he had to decide whether to use the allegations as impeachment material before the investigation was fully completed. But at the time of the hearing, defense counsel and the district court shared a reasonable belief that the investigation would quickly disprove the informant's allegations.

¶ 18  Defense counsel estimated that it would take no more than ninety days "to investigate this case and clearly determine [that] these charges [we]re categorically false." And the next day, the court's order granting the continuance likewise "anticipate[d]" that the special prosecutor's investigation "should not take a significant period of time to resolve the allegation . . . in a manner consistent with the representations of defense counsel." Thus, at the time of the hearing, the potential conflict had only a remote possibility of becoming an actual conflict.

¶ 19    Because there was no actual conflict at the time of the hearing, we need not determine whether Aragon validly waived his right to conflict-free counsel.[1]  *See Deutsch*, ¶ 20 (holding that the court's failure to advise the defendant of his right to conflict-free counsel did not require reversal when no actual conflict existed). We therefore conclude that the district court did not violate Aragon's right to conflict-free counsel.

### III.    Alternate Suspect Evidence

¶ 20    Aragon contends that the district court erred by excluding alternate suspect evidence.  We disagree.

### A.    Additional Background

¶ 21    After forensic testing of the evidence was complete, Aragon filed a motion seeking to present his thirteen-year-old nephew and a man named Henry Crump as alternate suspects.

¶ 22    With regard to his nephew, Aragon asserted the following in his offer of proof:

- The nephew "had an absolute obsession with knives and violence."

---

[1] Aragon does not argue on appeal that a waiver was required if there was only a potential conflict.

- The nephew "was infatuated with" the victim.

- The victim's vaginal swabs contained seminal fluid that could have come only from a man with a vasectomy or a boy entering puberty.

- The nephew's bedroom was adjacent to the room where the victim slept.

- Family members said that Aragon and the nephew shared clothing and that a pair of bloody shorts found at the crime scene belonged to the nephew.

- A family member said that she noticed blood on the nephew's bedsheets.

- Several people saw the nephew trying to scrub blood off his shoes.

- A relative said the nephew asked him to wash a knife that the nephew kept in a safe in his room.

- The nephew took and disseminated pictures and video of the victim's body.

- The nephew knew approximately how many times the victim had been stabbed before that information became public.

- Police collected a knife sheath from the house. The nephew owned a knife that fit the sheath.

¶ 23 With regard to Crump, Aragon asserted the following:

- Aragon owed Crump thousands of dollars.

- Crump showed up at Aragon's home the night before the victim was killed and threatened Aragon's family.

- On the day the victim was killed, Crump bragged about getting away with murder. He had no alibi during the relevant timeframe that day.

- Crump was the subject of a protection order in a separate case. The protected party in that case filed a letter with the court explaining that Crump had threatened to kill her.

- Two weeks after the murder, Crump brought a knife to the courthouse.

¶ 24 The district court denied the motion, finding that Aragon had failed to establish a nonspeculative connection between either

alternate suspect and the murder. The court further noted that forensic testing of the bloody clothing had revealed only Aragon's and the victim's DNA; both the nephew and Crump were "specifically excluded" as potential contributors.

### B. Governing Law and Standard of Review

¶ 25 "The Constitution guarantees a criminal defendant a meaningful opportunity to present a complete defense." *People v. Salazar*, 2012 CO 20, ¶ 17. However, this right is not absolute; it guarantees "only that the accused be permitted to introduce all relevant and admissible evidence." *Id.*; *see also People v. Cline*, 2022 COA 135, ¶ 77 (explaining that the right to present a defense is subject to the rules of evidence).

¶ 26 In *People v. Elmarr*, 2015 CO 53, ¶ 22, the supreme court held that "the admissibility of alternate suspect evidence ultimately depends on the strength of the connection between the alternate suspect and the charged crime." To be admissible, the alternate suspect evidence must be relevant, and its probative value must not be substantially outweighed by the danger of confusing the issues or misleading the jury. *Id.*

¶ 27     In this context, the touchstone of relevance is "whether the alternate suspect evidence establishes a non-speculative connection or nexus between the alternate suspect and the crime charged. That is, the alternate suspect evidence must create more than just an unsupported inference or possible ground for suspicion." *Id.* at ¶ 32. Accordingly,

> merely showing that someone else had a motive or opportunity to commit the charged crime — without other additional evidence circumstantially or inferentially linking the alternate suspect to the charged crime — presents too tenuous and speculative a connection to be relevant because it gives rise to no more than grounds for possible suspicion.

*Id.* at ¶ 34.

¶ 28     We review a district court's evidentiary decisions for an abuse of discretion. *Id.* at ¶ 20. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair or when it is based on a misapprehension of the law. *Id.*

¶ 29     An erroneous evidentiary ruling may rise to the level of a constitutional error if it deprived the defendant of a meaningful opportunity to present a complete defense. *People v. Conyac*, 2014 COA 8M, ¶ 93; *see Krutsinger v. People*, 219 P.3d 1054, 1061 (Colo.

2009).  But the right to present a defense "is violated only where the defendant was denied virtually his only means of effectively testing significant prosecution evidence."  *Conyac*, ¶ 93.

### C.   Discussion

¶ 30     We conclude that the district court neither abused its discretion nor violated Aragon's constitutional right to present a defense by excluding the alternate suspect evidence.

¶ 31     Aragon argues that both the nephew and Crump were sufficiently connected to the crime to make the evidence relevant. We agree that the evidence about the nephew and Crump suggested they had the opportunity and motive to commit the murder.  But there was no physical evidence connecting either alternate suspect to the murder.  Indeed, as the district court noted, the DNA profiles of both alternate suspects were specifically excluded from the tested evidence.  In contrast, Aragon's DNA was found on the bloody clothing and under the victim's fingernails.

¶ 32     *People v. Dhyne*, 2022 COA 122, *aff'd on other grounds by*, 2024 CO 45, is instructive.  In that case, there was evidence that the defendant's landlord's son, a registered sex offender, had both motive and opportunity to commit the charged offense of

downloading child pornography. *Id.* at ¶ 27. Noting the supreme court's holding that "evidence merely showing that someone else had a motive or opportunity to commit the charged crime . . . presents too tenuous and speculative a connection to be relevant," however, the *Dhyne* division held that the evidence linking the landlord's son to the crime was too speculative to establish an alternate suspect connection. *Id.* at ¶¶ 27-28 (quoting *Elmarr*, ¶ 34).

¶ 33 Similarly, here, there was no nonspeculative evidence linking the nephew or Crump to the murder beyond their motive and opportunity. Thus, although it is a close call, we conclude that the district court did not abuse its discretion by excluding the alternate suspect evidence.

¶ 34 Finally, Aragon was able to subject the prosecution's case to meaningful adversarial testing. *See, e.g.*, *Krutsinger*, 219 P.3d at 1062 ("[T]he standard or test for assessing whether a defendant's right to confront or present a defense has been violated by evidentiary rulings is clearly dependent upon the extent to which he was permitted to subject the prosecutor's case to 'meaningful adversarial testing.'" (quoting *Crane v. Kentucky*, 476 U.S. 683, 691

14

(1986))). Aragon mounted a case that police "settled on him as the suspect from the beginning" without conducting a competent investigation. He advanced this theory by attacking the failures in the preservation of evidence and the credibility of the prosecution's witnesses. The district court therefore did not violate Aragon's constitutional right to present a defense.

## IV. Police Misconduct Evidence

¶ 35 Aragon contends that the district court erred by excluding certain evidence of police misconduct and a separate stabbing in the neighborhood. We disagree.

### A. Additional Background

¶ 36 During the first trial, after the prosecution rested, the prosecutor informed the court that an investigator had "unearthed" a box of supposedly missing evidence that had been collected by the Rocky Ford Police Department (RFPD). The prosecution disclosed that the FBI was investigating allegations of corruption at the RFPD and had seized evidence logs. These late disclosures led to a mistrial.

¶ 37 Aragon sought broad latitude to present evidence of corruption at the RFPD on retrial. The court ruled that Aragon could present

evidence of corruption, but within limits.  Specifically, the court noted:

> The corruption investigation is the reason why there is a retrial, and the Court determines that the jury should not be insulated from the reality of those circumstances because a trial is a search for the truth. . . .  This does not mean that the Defendant will have unlimited latitude, and the focus of the trial will remain on whether the Defendant is responsible for the murder of [the victim].

¶ 38    The second trial did not proceed beyond voir dire because transcripts from the first trial were not yet available for counsel's review.

¶ 39    After the prosecution rested its case at the third trial (from which this appeal arises), Aragon made an offer of proof to present evidence from the corruption investigation as it related to (1) the RFPD's poor evidence-handling practices; (2) allegations that the former RFPD chief gave favorable treatment to local criminals he knew; and (3) allegations that the former chief was involved with local drug traffickers.  The court ruled that it would allow Aragon to present evidence of the investigation only as it related to the RFPD's poor evidence-handling practices.  It explained:

16

> The Court finds that the balance of the proffer should not be authorized, because these are suggestions that are not relevant to the loss of [evidence], the poor evidence handling practices of the Rocky Ford Police Department, and would result in the trial being shifted to a trial about the Rocky Ford Police Department. The Court believes that by authorizing the evidence that I have authorized the defense to present, that that provides a meaningful remedy, while at the same time maintaining the focus of the trial where it should, which is on whether Mr. Aragon committed the crime.

¶ 40   The next day, Aragon argued that evidence of unsolved local crimes — a stabbing and a string of burglaries — was relevant to support his theory that "someone outside the house committed this crime" and to demonstrate the corruption and incompetence at the RFPD.  The court ruled that the victim of the stabbing could not testify about the assault or the identity of her assailant because "it would not be possible to prevent the jury from considering this evidence as alternate suspect evidence once it was admitted" and there was no nexus between the assailant in the stabbing incident and this case.  However, the court allowed the stabbing victim to testify about the "general dangerous nature of the neighborhood," and it permitted the burglary victim to testify about multiple burglaries at her home.

17

## B. Governing Law and Standard of Review

¶ 41    Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401. Generally, all relevant evidence is admissible, and evidence that is not relevant is not admissible. CRE 402. But under CRE 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, potential to mislead the jury, undue delay, waste of time, or needless presentation of cumulative evidence.

¶ 42    We review a district court's evidentiary decisions for an abuse of discretion. *Elmarr*, ¶ 20.

## C. Discussion

¶ 43    Aragon argues that the court erred by excluding evidence of corruption allegations against the former RFPD chief because such evidence was relevant to the chief's credibility. He further argues that the court erred by excluding evidence of the separate stabbing because it "showed the RFPD was incompetent and that someone else was stabbing women in the same neighborhood."

¶ 44     As the district court explained in its ruling, the allegations

against the police chief were unrelated to the loss of evidence in this

case, and admitting the allegations would "result in the trial being

shifted to a trial about the Rocky Ford Police Department." CRE

403 permits relevant evidence to be excluded if its probative value is

substantially outweighed by the danger of confusing the issues.

Under these circumstances, we conclude that the district court did

not abuse its discretion by excluding the corruption evidence.

¶ 45     As to the stabbing incident, we agree with the district court

that there was "no nexus between [the alleged assailant], whether

he is named or unnamed, and the crime charged." As the court

noted, the stabbing victim was "stabbed once when she opened the

door and [the alleged assailant] ran away," while the victim in this

case "suffered 103 wounds." The district court thus did not abuse

its discretion by excluding this evidence under CRE 403.

¶ 46     Additionally, as the People note, admitting evidence of the

corruption allegations against the police chief and the stabbing

victim's testimony about her assault would have "compelled the

prosecution to introduce rebuttal evidence" to show why the chief

was not prosecuted for those allegations and why the stabbing

incident remained unsolved.  Such efforts would have wasted time and risked confusing the issues.  *See People v. Pinkey*, 761 P.2d 228, 229 (Colo. App. 1988) ("The court did not abuse its discretion in limiting cross-examination which would have injected collateral issues and unduly prolonged the proceedings. . . .  [A] trial court has the responsibility to assure that the 'sideshow does not take over the circus.'" (citation omitted)).

## V.     Motion to Disqualify the District Attorney

¶ 47    Aragon contends that the district court erred by denying his motion to disqualify the district attorney.  We perceive no abuse of discretion.

## A.     Additional Background

¶ 48    Jeremiah Stoker, an officer with the RFPD, is the son-in-law of the district attorney who prosecuted Aragon's case.  After Aragon's arrest, Stoker transported him to the RFPD and placed him in a cell.  Stoker testified that, when he opened the cell door to investigate a noise, Aragon "rushed towards the door" holding "two metal pipes that he had ripped from the electrical conduit off the ceiling."  Stoker closed the door before Aragon reached it.

20

¶ 49     As a result of this incident, the district attorney charged
Aragon with attempted escape, menacing, and first degree assault
in a separate case.  Aragon moved to exclude evidence of the alleged
escape attempt in this case, but the district court ruled it
admissible to show consciousness of guilt.

¶ 50     Aragon then moved to disqualify the district attorney, arguing
that the close familial relationship between the district attorney and
Stoker "constitute[d] both a personal interest in the case[] and
special circumstances rendering it unlikely that Mr. Aragon c[ould]
receive a fair trial."  Specifically, Aragon argued that Stoker was the
sole witness to his alleged escape attempt; Stoker's credibility and
bias would thus be of critical importance to the case; and the
personal relationship would lead "the district attorney's office [to]
feel that they need[ed] to vindicate and defend any attacks on
Mr. Stoker's character or credibility, above and beyond their
'professional ability to uphold the law.'"  *See Huang v. Cnty. Ct.*,
98 P.3d 924, 928 (Colo. App. 2004) ("[D]isqualification is
appropriate only when the district attorney has some involvement
in the litigation, apart from his or her professional responsibility of

upholding the law, which would impair that office's ability to prosecute the case fairly.").

¶ 51     After a hearing, the district court denied the motion to disqualify. The court acknowledged that Stoker would be a witness in the case but ruled that it "cannot find that the District Attorney is somehow vested in vindicating the credibility of Mr. Stoker."

¶ 52     At trial, Stoker was questioned about his relationship with the district attorney. Before closing arguments, the district court instructed the jury to consider "any relationship each witness may have to either side of the case; the manner in which each witness might be affected by the verdict; and . . . all facts and circumstances shown by the evidence which affect[] the credibility of the witness' testimony."

### B. Governing Law and Standard of Review

¶ 53     "[D]isqualifying the district attorney is a drastic remedy that should only occur in narrow circumstances." *People v. Loper*, 241 P.3d 543, 547 (Colo. 2010). As relevant here, a district attorney may be disqualified from a case when the district attorney has a personal interest in the case or when special circumstances exist that would render it unlikely that the defendant would receive

22

a fair trial. *People v. Solis*, 2022 CO 53, ¶ 23; § 20-1-107(2), C.R.S. 2025.

¶ 54     A party who moves to disqualify the district attorney under the personal interest prong must show that the district attorney "stands to receive some personal benefit (or suffer some detriment) from the outcome of the prosecution that is unrelated to his duty to enforce the law." *People in Interest of N.R.*, 139 P.3d 671, 676 (Colo. 2006). A party who moves to disqualify the district attorney under the special circumstances prong must show that "it is unlikely that the defendant will receive a fair trial." *Loper*, 241 P.3d at 546.

¶ 55     "We review a trial court's decision to disqualify a district attorney for an abuse of discretion." *Id.*

C.     Discussion

¶ 56     The district court did not abuse its discretion by finding that no personal interest or special circumstances existed in this case. Defense counsel argued that the district attorney's interest in protecting his son-in-law's credibility constituted both a personal

interest and special circumstances.[2]  However, this was insufficient

to warrant the drastic remedy of disqualification.  *See id.* at 543;

*N.R.*, 139 P.3d at 674 (holding that no special circumstances

existed even though the district attorney had received substantial

support from the victim's family in his political campaign and his

decision to prosecute the defendant reversed the former district

attorney's decision not to); *People v. Lincoln*, 161 P.3d 1274, 1281

(Colo. 2007) (holding that the evidence was insufficient to show the

defendant was unlikely to receive a fair trial when the district

attorney had previously represented the same victim in a separate

case).

¶ 57      "Although such circumstances may cast doubt upon a district

attorney's motives and strategies, they do not play a part in whether

a defendant will receive a fair trial."  *Loper*, 241 P.3d at 547.  Thus,

even if the district attorney's familial relationship with Stoker may

have created an appearance of impropriety, it was not an abuse of

discretion to deny the motion for disqualification.  *See id.* ("[F]acts

---

[2] Defense counsel acknowledged at the hearing that the claimed personal interest and special circumstances were essentially the same: the district attorney's desire to "vindicate . . . the credibility" of his son-in-law.

showing an appearance of impropriety are no longer relevant to the determination of whether to disqualify a district attorney.").

¶ 58    We are not persuaded otherwise by Aragon's argument that the district attorney knew Stoker was being investigated by the RFPD for misconduct and failed to disclose that information to the defense, thereby demonstrating his personal interest in the case and the special circumstances necessitating disqualification. The district attorney objected to this line of argument at the hearing, and the district court sustained the objection; further, the court did not allow the defense to call the district attorney as a witness to establish his knowledge regarding the RFPD investigation of Stoker. Aragon does not challenge these rulings on appeal and does not develop his arguments beyond asserting that the district attorney withheld exculpatory information from the defense. *See People v. Stone*, 2021 COA 104, ¶ 52 (appellate courts do not address undeveloped arguments).

## VI.   Sanction for Destruction of Evidence

¶ 59    Aragon contends that the district court erred by imposing an inadequate sanction for the destruction of evidence. We are not persuaded.

## A.    Additional Background

¶ 60    The victim's body was found on a mattress covered in blood stains.  Police collected the mattress and brought it to the RFPD.  An RFPD officer placed the mattress in a garage and left for vacation without labeling it.

¶ 61    Aragon asked the district court to order the preservation and production of all physical evidence in the case, and the district court granted the motion.  But a different RFPD officer threw the bloody mattress away because it did not have an evidence tag.  The district court described the RFPD officers' negligence as "breathtaking."

¶ 62    Aragon moved to dismiss the case based on the destruction of the mattress.  After a hearing, the district court denied the motion, finding no evidence of bad faith by the RFPD in discarding the mattress.

¶ 63    Aragon next requested that the court give the jury an adverse inference instruction with the following language:

> You are instructed you may infer by reason of
> Rocky Ford Police Department's failure to
> preserve the mattress pad that the evidence it
> contained may have been able to provide

26

relevant information to assist the defense in this case or possibly exonerate Mr. Aragon.

¶ 64    Over defense counsel's objection, the court instead gave the following instruction:

> It is the duty of a party not to take action that will cause the destruction or loss of relevant evidence, hindering the other side from making its own examination and investigation of all potentially relevant evidence relating to whether that party's fault caused the incident in question. You are instructed that the mattress pad upon which [the victim's] body was discovered was taken into evidence by the Rocky Ford Police Department in July of 2015. The Rocky Ford Police Department failed to preserve the bloody mattress pad or perform any tests on it.
>
> You are instructed you may infer, by reason of the Rocky Ford Police Department's failure to preserve the mattress pad, that the evidence it contained may have been able to provide relevant information to assist the defense in this case. You may also consider whether the destruction of the mattress pad affected the ability of Mr. Aragon's attorneys to challenge any witness' version of the events that led to [the victim's] death.
>
> Finally, you are instructed that the absence of evidence may be the basis of a reasonable doubt with respect to Mr. Aragon's guilt.

B.    Governing Law and Standard of Review

¶ 65    "The Due Process Clause of the Fourteenth Amendment mandates that the state disclose to criminal defendants favorable evidence that is material to either guilt or punishment." *People v. Braunthal*, 31 P.3d 167, 172 (Colo. 2001). "When it is reasonably foreseeable that evidence may be favorable to the accused, the prosecution must employ procedures to preserve such evidence." *Id.*

¶ 66    To establish a due process violation based on the state's failure to preserve potentially exculpatory evidence, a defendant must show that "(1) the state suppressed or destroyed the evidence; (2) the evidence had an exculpatory value that was apparent before it was destroyed; and (3) he was unable to obtain comparable evidence by other reasonably available means." *People v. Eason*, 2022 COA 54, ¶ 37. If the evidence was not "apparently exculpatory, but only potentially useful," the defendant must show that the state "destroyed the evidence in bad faith." *Id.* at ¶ 38. Negligent destruction of evidence ordinarily does not constitute a due process violation. *People v. Young*, 2014 COA 169, ¶ 69. Under some circumstances, however, gross negligence may

28

constitute bad faith. *See People v. Scarlett*, 985 P.2d 36, 39 (Colo. App. 1998).

¶ 67    "If we determine that a due process violation occurred, then we must decide whether the district court 'fashioned an appropriate remedy, [while] recognizing that the trial court has broad discretion in this regard.'" *Eason*, ¶ 39 (quoting *People v. Enriquez*, 763 P.2d 1033, 1036 (Colo. 1988)). "In determining the appropriate remedy for the state's destruction of evidence amounting to a due process violation, a court should consider the state's degree of culpability, the need to preserve the integrity of the truth-finding process, and the need for deterrence of the conduct at issue." *Id.* "As a general matter, in the event of a discovery violation by the People, dismissal is inappropriate if any prejudice can be cured by a lesser sanction." *Id.*

¶ 68    We review de novo whether the state violated a defendant's due process rights, but we review whether the district court fashioned an appropriate remedy for an abuse of discretion. *Id.* at ¶ 40.

## C.    Discussion

¶ 69    Aragon concedes that the mattress was not "apparently exculpatory, but only potentially useful," *Eason*, ¶ 38, because it could have been subjected to DNA testing that might have "led to potential alternate suspects or excluded Aragon." Accordingly, he acknowledges that to establish a due process violation, he was required to show that the RFPD acted in bad faith. *See id.* Under the circumstances of this case, Aragon argues, the RFPD's "breathtaking" negligence in handling the evidence amounts to bad faith.

¶ 70    Even assuming, without deciding, that Aragon's due process rights were violated, we conclude the district court did not abuse its discretion in crafting a remedy. First, we agree with the district court that dismissal was not required to preserve the integrity of the truth-finding process. A witness estimated that the Colorado Bureau of Investigation took approximately 100 photographs of the victim's body on the mattress. Based on the photographs, for example, Aragon's expert in death investigations was able to offer an opinion about how the victim's body had been moved. And Aragon's closing argument emphasized the loss of the mattress as

evidence of the RFPD's incompetence and argued that this failure supported a reasonable doubt.

¶ 71 Second, we are not persuaded by Aragon's contention that the court's adverse inference instruction "did nothing to cure the due process violation" because it did not inform the jury that the mattress may have contained evidence "to . . . possibly exonerate" him. Considering the other evidence of Aragon's guilt, including his DNA on the bloody clothes and under the victim's fingernails, Aragon does not explain how someone else's DNA on the mattress or the absence of his own would have definitively exonerated him. Moreover, far from being "toothless," as Aragon claims, the district court's instruction made clear to the jury that (1) it could infer evidence contained on the mattress "may have been able to provide relevant information to assist the defense in this case"; (2) it could "consider whether the destruction of the mattress pad affected the ability of Mr. Aragon's attorneys to challenge any witness' version of the events that led to [the victim's] death"; and (3) "the absence of evidence may be the basis of a reasonable doubt with respect to Mr. Aragon's guilt." Combined with the instruction on the prosecution's burden of proof and reasonable doubt standard, we

31

conclude that this adverse inference instruction was an adequate remedy.

## VII. Confrontation of Jailhouse Informant

¶ 72 Aragon contends that the district court erred by preventing him from cross-examining the jailhouse informant about the informant's allegation that prior defense counsel threatened him. We discern no error.

### A. Additional Background

¶ 73 As discussed above, the jailhouse informant alleged both that Aragon confessed to him and that Aragon's counsel threatened him to prevent him from testifying. In its order referring the matter to a special prosecutor, the court speculated that "the defense most likely has a recording of the [relevant] interview" and noted that, "if the allegations made by [the informant] [we]re false," his statements "would constitute impeachment information that would be relevant to the credibility of [the informant's] testimony." The court acknowledged that, while the defense already had considerable impeachment material about the informant, a recording directly exposing the informant's dishonesty would be far more compelling for the jury.

¶ 74    At the first trial, when Aragon sought to cross-examine the informant about the alleged threat from prior defense counsel, the court barred him from doing so.  The court explained that, although it had earlier assumed the informant's claim would be disproven, the special prosecutor's investigation ended without a definitive conclusion.  Because the informant's claim was never clearly shown to be false, the court found that permitting cross-examination on this point would "create a mini trial within this trial" regarding "the circumstance between [the informant] and [prior defense counsel]." Defense counsel objected, arguing the court's ruling violated Aragon's right to confrontation.

¶ 75    Although the first trial ended in a mistrial, the district court's ruling became the law of the case.

¶ 76    At the third trial, the court permitted the defense to cross-examine the informant about his prior felony convictions involving dishonesty; his statement to a defense investigator that he believed Aragon was innocent; and the dismissal of his own criminal case following his claim that Aragon confessed to him.  In closing, defense counsel argued that the informant was not credible based

33

on his prior felonies, inconsistent statements, and self-interested motives for testifying.

## B. Governing Law and Standard of Review

¶ 77 A defendant's right to confront witnesses is guaranteed by both the Sixth Amendment of the United States Constitution and article II, section 16, of the Colorado Constitution. *Kinney v. People*, 187 P.3d 548, 558-59 (Colo. 2008). "The primary interest secured by the right to confrontation is the right of cross-examination." *Id.* at 559. But "trial courts retain wide latitude to impose 'reasonable limits on cross-examination' under the rules of evidence." *People v. Reynolds-Wynn*, 2024 COA 33, ¶ 25 (quoting *Kinney*, 187 P.3d at 559). Generally, all relevant evidence is admissible unless its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. *Reynolds-Wynn*, ¶ 25; CRE 401; CRE 402; CRE 403.

¶ 78 Under CRE 608(b), a witness may be cross-examined about specific instances of prior conduct that are probative of the

witness's truthfulness or untruthfulness, but extrinsic evidence may not be used to prove that conduct.

¶ 79  "We review de novo a defendant's contention that the trial court violated his Confrontation Clause rights." *People v. Carter*, 2015 COA 24M-2, ¶ 28.

## C.  Discussion

¶ 80  Because it was foreseeable that the jailhouse informant would persist in his allegation against prior defense counsel at trial, cross-examination alone would not have shown the allegation was untruthful.  But CRE 608(b) prohibits the use of extrinsic evidence to prove specific instances of a witness's conduct for the purpose of attacking the witness's character for truthfulness.  *See People v. Wilson*, 2014 COA 114, ¶ 32 ("Under CRE 608(b), a witness may be cross-examined about specific instances of conduct that are probative of the witness's character for truthfulness or untruthfulness, but extrinsic evidence (*e.g.*, evidence from another witness) may not be used to prove that conduct.").

¶ 81  Furthermore, as the district court observed, allowing cross-examination about the informant's allegation against prior defense counsel risked "creat[ing] a mini trial" over that incident.  Under

CRE 403, relevant evidence may be excluded if, among other things, its probative value is substantially outweighed by the danger of confusing the issues. Because Aragon was able to challenge the informant's credibility with his prior felonies, inconsistent statements, and self-interested motives for testifying, we conclude that the district court did not violate Aragon's confrontation rights by precluding cross-examination on the informant's allegations under CRE 403. *See Wilson*, ¶ 45 ("While a trial court may not limit excessively a defendant's cross-examination concerning a witness's bias, prejudice, or motive for testifying, it 'has wide latitude, insofar as the Confrontation Clause is concerned, to place reasonable limits on cross-examination' pursuant to CRE 403." (quoting *Merritt v. People*, 842 P.2d 162, 166 (Colo. 1992))).

## VIII.  Cumulative Error

¶ 82    Finally, Aragon contends that, even if the district court's individual errors do not require reversal, their cumulative prejudicial impact does. "For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not." *Howard-Walker v. People*, 2019 CO 69,

36

¶ 25. Because we have assumed only one error and concluded it does not warrant reversal, we necessarily reject Aragon's cumulative error argument. *See People v. Thames*, 2019 COA 124, ¶ 69 ("Even assuming that the trial court erred once, a single error is insufficient to reverse under the cumulative error standard.").

## IX. Disposition

¶ 83 We affirm the judgment.

JUDGE GROVE and JUDGE SCHOCK concur.